UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| RAYMOND PROFESSIONAL GROUP, INC. | ) | Bankruptcy No. 06 B 16748 |
| Debtor. | ) | |
| | ) | |
| RAYMOND MANAGEMENT SERVICES, | ) | |
| INCORPORATED n/k/a RAYMOND | ) | |
| PROFESSIONAL GROUP - DESIGN/BUILD, | ) | |
| INC. | ) | |
| Plaintiff, | ) | |
| | ) | Adversary No. 07 A 00137 |
| v. | ) | |
| | ) | |
| WILLIAM A. POPE COMPANY | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION ON DEFENDANT
POPE'S MOTION FOR SUMMARY JUDGMENT

This proceeding was filed by the Plaintiff to vacate an arbitration award in favor of

Defendant. It is related to the filing by Raymond Professional Group, Inc. under Chapter 11 of

the Bankruptcy Code. The background of this litigation follows:

Raymond Professional Group, Inc. ("Debtor" or "RPG") is the 100% shareholder of the

Adversary Plaintiff Raymond Professional Group – Design/Build, Inc. f/k/a Raymond

Management Services, Inc. ("Plaintiff" or "RPG - Design/Build").[1] Debtor provided shared

corporate services to each of its subsidiaries, including Plaintiff. The subsidiaries provided

engineering, architectural, design/build and other technical services to private and government

clients, primarily in the power, industrial and process market sectors.

Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code in

Case No. 06-16748. Plaintiff, RPG - Design/Build, also filed for voluntary Chapter 11 relief, in

---

[1] Additional wholly-owned subsidiaries include Raymond Professional Group – A/E, Inc. ("RPG - A/E"), Raymond Professional Group – Government, Inc. ("RPG - Government"), and Raymond International, Inc. Raymond Professional Group Puerto Rick Engineering PSC is an affiliate of RPG through common ownership.

Case No. 06-16753, as did other related entities.[2]  An Order was entered for procedural consolidation and joint administration.

During the year 2000, Plaintiff entered into a contract with AES Medina Valley Cogen, LLC ("AES") to construct a cogeneration power plant facility in Mossville, Illinois. Plaintiff was to perform all engineering, procurement, and construction services necessary to satisfy certain specified performance criteria for the lump sum price of approximately $34 million (the "EPC Contract"). On September 12, 2000, Plaintiff entered into a subcontract with William A. Pope Co. ("Pope") whereby Pope became responsible for performing all construction services and certain other services in the EPC Contract (the "Subcontract"). Plaintiff and Pope each agreed to perform tasks within their respective scope of work, and thereafter equally share any resulting profits or losses on the project. The parties agreed to establish a bank account (the "Initial Account") into which Plaintiff would deposit any amount collected from AES above the parties' expenses. Plaintiff funded the Initial Account with more than $2 million of project receipts from AES incurred as of February 2001.

After the Initial Account was funded, certain disputes arose regarding expenses the parties claimed to have incurred, as well as performance-based claims concerning certain pipe welds constructed by Pope. The parties entered into an Interim Settlement Agreement dated September 26, 2001, pursuant to which Plaintiff deposited additional funds into the Initial Account.

On March 12, 2003, the funds were transferred, with the permission of Pope, to an account (the "Account") with JP Morgan Chase Bank, N.A. ("Chase"). The Account documents required the dual signatures of Douglas J. Chidley ("Chidley"), Debtors' President, and Paul L. Troyke ("Troyke"), Pope's President, to withdraw funds. The Account was originally titled

---

[2] Raymond Professional Group - A/E (in Case No. 06-16749), RPG – Government (in Case No. 06-16750), Raymond International, Inc. (in Case No. 06-16754), and RPG – Puerto Rico (in Case No. 06-16755) have also each filed voluntary chapter 11 petitions.

"Raymond Professional Group    Pope Joint Account", but after the bankruptcy filing was changed to "Raymond Professional Group, Inc. DIP."

The cost and performance-based disputes between these parties were arbitrated under American Arbitration Association procedures as required by an arbitration clause referenced in the Subcontract Agreement. On November 30, 2006, the Arbitration Panel ("Panel") entered an award requiring Plaintiff to pay Pope $3,634,714 ("Award"). Plaintiff defeated all of Pope's performance-based claims; the Award was based on "Audit Issues." This Adversary proceeding was brought by RPG    Design/Build against Pope seeking vacatur of the Award, now pending as Plaintiff's Amended Petition to Vacate Arbitration Award.

Debtor has filed a separate Adversary Complaint against Pope (No. 07 A 00639) to determine ownership of the Account as between Debtor and Pope. Pope's defense of this Adversary is one step in its asserted bankruptcy claim. In this proceeding, it seeks to defend the Award in its favor. In the other proceeding, No. 07 A 00639, it seeks to obtain the Account monies now held by Debtor to apply on its Award.

Plaintiff's Adversary attacks the Arbitration Award on five grounds:

| | |
|---|---|
| Count I | That the arbitration panel improperly included in the award $1 million recovered as insurance defense benefits as "project revenue" to be shared equally by the parties; |
| Count II | That the panel improperly attributed $579,752 to Pope for "project costs" for owned equipment and tool costs; |
| Count III | That the panel improperly considered the opinions of two auditors (one retained by each party) although the Subcontract Agreement said the parties would employ "*a* firm" (argued to mean only one firm) to conduct an audit in the case of a dispute. (Emphasis added). |
| Count IV | That the Award was not well reasoned. |
| Count V | That Pope did not disclose a final lien waiver which released a claim for costs, a document that was arguably inconsistent with the costs claimed by Pope at the arbitration; therefore, Pope is said to have obtained the arbitration award by "undue means" under the Illinois Arbitration Act. |

Pope has moved herein for Summary Judgment confirming the Award. Pursuant to this Opinion, that Motion will be allowed and by separate Judgment Order the petition by RPG Design/Build to vacate the Arbitration Award will be denied and the Award will be confirmed.

The parties generally followed Summary Judgment procedures required by Local Bankruptcy Rule 7056-1 and Rule 7056 Fed. R. Bankr. P. However, the determination of Undisputed Facts was made more difficult than usual for three reasons:

a.  Pope included a number of exhibits in support of its Motion for Summary Judgment, but it did not always cite the source material in its Amended Statement of Material Facts. Plaintiff objected that Pope is improperly trying to introduce "hearsay" through the affidavit of Ms. Votava when it tried to use the affidavit to describe what was in the exhibits.

b.  Pope did not provide a very coherent narrative with its Statement of Material Facts. That statement was not organized chronologically or by topic, and contains many irrelevant facts.

c.  In its Response, Plaintiff refused to admit clearly to the content of the documents relied on, denying then "to the extent the averments are inconsistent [with the writing]" without specifying what, if anything, was objected to.

However, the exhibits themselves were not disputed as to authenticity and they were searched in preparation of this Opinion to find the materials relied upon in the following Undisputed Facts. Those Facts were drafted to focus on issues relevant to the Award and Motion for Summary Judgment under applicable legal standards. Many extraneous matters were argued by the parties but were not necessary to this ruling and were therefore not discussed here.

## UNDISPUTED FACTS

1.  On September 12, 2000, Raymond Management Services, Inc. [n/k/a Raymond Professional Group – Design/Build, Inc.] ("RMS") entered into an Agreement for Engineering, Procurement and Construction Services (the "EPC Contract") with AES Medina Valley Cogen, LLC ("AES") for the construction of a cogeneration facility in Mossville, Illinois. (See Def.'s Am. Stmt. Of Mat. Facts [hereinafter Def.'s Am. Stmt.], Ex. A.) The lump sum, fixed price for the Project was $34,600,000.00. (Id. at 30 ¶ 4.1.)

2.  William A. Pope Company ("Pope") was not a party to the EPC Contract.

3.      (a) The EPC Contract called for RMS to

> [C]omplete the project by performing or causing to be performed all work
> and services required or appropriate in connection with the design,
> engineering, procurement, site preparation and clearing, civil works,
> manufacture, construction, store, construction management, start-up,
> training, commissioning and testing of the Facility, and provide all
> materials and Equipment, machinery, tools, construction fuels, chemicals
> and utilities, labor, transportation, administration and other services and
> items, whether of a temporary or permanent nature, required to complete
> the Project, and unpack, store, install and erect the Solar Equipment, all on
> a lump sum, fixed price, turnkey basis and otherwise in accordance with
> this Agreement (collectively the 'Work').

(Def.'s Am. Stmt., Ex A at 14 ¶ 2.1.)

> (b) In addition, the EPC Contract contained the following dispute resolution procedures:

> 21.1 Dispute Resolution. In the event a dispute arises between Owner and
> Contractor regarding the application or interpretation of any provision of this Agreement,
> or the amount of any Contractor's Payment Request, the aggrieved Party shall promptly
> give notice in writing to the other Party invoking the provisions of this Section 21.1.

>> (a) The aggrieved Party shall give notice of the nature of the dispute, the disputed
>> amounts, if any, and the reason for the dispute (the "Dispute");

>> (b) Within fourteen (14) days of the notification, the Parties will meet to discuss
>> and resolve the Dispute;

>> (c) If the meeting is not successful in resolving the Dispute, the Parties agree to
>> refer the dispute to senior management for discussion and resolution; and

>> (d) If senior management is not successful in resolving the Dispute within
>> fourteen (14) days of referral, either Party may seek binding arbitration before the
>> Chicago, Illinois office of the American Arbitration Association using the then
>> current version of the Construction Industry Rules.

> Contractor shall not terminate the Agreement or discontinue performing the Work during
> the pendancy [sic] of a Dispute concerning a Contractor's Payment Request. If the
> Contractor prevails in the Dispute concerning a Contractor's Payment Request, the
> Contractor shall be entitled to interest on the disputed amount calculated at the rate set
> forth in Section 25.1. The Owner agrees not to withhold payment of any undisputed
> amounts owed to Contractor during the pendancy [sic] of a Dispute concerning a
> Contractor's Payment Request.

> 21.2 Performance During Dispute. Notwithstanding the existence of a Dispute
> between Owner and Contractor and regardless of whether such Dispute is the subject of
> dispute resolution pursuant to Section 21.1, Contractor shall not be entitled to suspend or
> otherwise delay the performance of the Work because of the Dispute or the Owner's
> refusal to pay a disputed amount.

(Id. at 73 ¶¶ 21.1 and 21.2.)

(c)    Both the EPC Contract and Subcontract Agreement discussed below contain "Choice of Law" provisions designating the laws of the State of Illinois to govern those agreements. (Def.'s Am. Stmt., Ex. A ¶ 25.4 at 77, Ex. E ¶ 11 at 4.)

4.    In January of 2001, RMS and Pope entered into a subcontract for the Project (the "Subcontract Agreement") effective September 12, 2000. (See Def.'s Am. Stmt., Ex. E.) It was the stated intent of the Parties under the Subcontract Agreement "to discharge and perform, as capably and efficiently as reasonably possible, the obligations of RMS to [AES] in the EPC Contract." (Id. at 2 ¶ 2.)

5.    The Subcontract Agreement allocated revenues paid on the Project as follows: "First, to pay the costs incurred by the Project to third parties; second, to reimburse RMS and [Pope] for their own costs and the time spent by their own personnel on the Project, including costs incurred in the preparation of the proposal; third, to provide an allowance to each of RMS and [Pope] for the succeeding month's projected expenses; and finally, the remainder shall be divided equally between RMS and [Pope]." (Id. at 2 ¶ 7.)

6.    Furthermore, "[t]he undisputed amounts of [Pope's] pay request will be paid by RMS immediately following receipt of payment from [AES]." (Id. at 3 ¶ 7.)

7.    The Subcontract Agreement provided that "[a]n escrow account will be established whereby each Party will make appropriate cash contributions that represents the cash amounts collected over and above the agreed to costs. Distributions from the escrow account will [sic] made only with the agreement of the principals of both Parties." (Id. at 2 ¶ 7.)

8.    In addition, the Subcontract Agreement provided that "[a]ll revenues received by RMS and [Pope] as a result of or having to do with the Project from insurance companies or other parties shall be shared equally by the Parties after all costs are paid." (Id. at 3 ¶ 8.)

9.  The Subcontract Agreement also provided that "[a]ny disputes between or among RMS, [Pope] and Engineer shall be resolved in accordance with the dispute resolution procedures of the EPC Contract...." (Id, at 4 ¶ 11.)

10. The parties agreed that the Subcontract Agreement would be governed by laws of the State of Illinois. (Id.)

### The Lien Waiver

11. On September 26, 2001, RMS, Pope, and National Fire Insurance Company ("NFIC") entered into an Interim Settlement Agreement (the "ISA") to resolve "[c]ertain disputes ... between Raymond and Pope regarding various events and accounting issues that have arisen during the project. As a consequence of the disputes over these events and accounting issues, Pope ... sent a Notice of Claim of Subcontractor dated June 21, 2001, to the owner of the Project, Raymond has withheld certain funds otherwise owed to Pope, and Pope has asserted a claim against Raymond's payment bond surety, CNA." (Def.'s Am. Stmt., Ex. F at 1 ¶¶ C and D.)

12. According to paragraph 3 of the ISA, "Immediately upon the deposit and payment described in Paragraph 1 above, Pope agrees to execute and deliver to Raymond a document in a form reasonably acceptable to both parties and AES Medina Valley Cogen, L.C.C. releasing the lien claim asserted by Pope as described above."

13. A letter dated January 29, 2003, was sent by Pope's counsel to RMS' counsel "confirm[ing] [RMS'] January 29, 2003 request that Pope provide a Final Waiver of Lien pursuant to paragraph 3 of our Interim Settlement Agreement dated September 26, 2001, in order to assist Raymond in settling its claims against the project's owner."

14. A letter dated February 4, 2003, was sent by AES' counsel to RMS' counsel confirming that Pope supplied AES with a final waiver of lien as required by the January 30, 2003 Settlement Agreement between RMS and AES.

15. RMS was aware that Pope supplied a final lien waiver to AES, but was not given a copy of the actual lien waiver until after the related bankruptcy case was filed.

16. On September 9, 2003, RMS filed a demand for arbitration. (See Def.'s Am. Stmt., Ex. G.) As part of its prayer for relief, RMS requested the following: "As an interim measure, Raymond will request to be allowed to have an independent accounting firm audit Pope's costs for the project. As part of the final award, Raymond will request the arbitrators to allocate between the parties a previously-escrowed sum paid by AES." (Id.)

17. Pope filed a Counterclaim on November 11, 2003. (See Def.'s Am. Stmt., Ex. H.) Among other things, "Pope request[ed] that the Arbitrator direct Raymond to comply with Paragraph 7 of the Interim Agreement (B), and determine what additional sums are due Pope under Paragraph 9 of the Interim Agreement (B)." (Id.) In addition, Pope asserted "claims for damages against Raymond arising out of Raymond's late and erroneous engineering, Project mismanagement, Project cost overruns, and smaller claims that will be detailed in later submittals." (Id.)

18. The arbitration panel consisted of Franklin I. Kral, Allan M. Pickus and James J. Adrian.

### Selection of Auditors

19. According to the Subcontract Agreement, "In the event that either Party at any time believes that an independent audit of the Project's profitability is warranted, then the Parties agree to engage a firm for this purpose." (Def.'s Am. Stmt., Ex. E at 2 ¶ 7.)

20. On February 18, 2004, the arbitration panel's Corrected Memorandum of Conference Call was entered in the arbitration proceeding. (See Def.'s Am. Stmt., Ex. P.) According to the Corrected Memorandum, "By 3/15/04 counsel shall exchange and direct to the panel members, with copy to the Case Manager, either a) The identification of a mutually acceptable independent auditor (free of conflict with both counsel, counsels' firms and the client), or b) Each counsel shall submit the identification of three independent auditors (free of conflict with counsel, counsels' firms, and the clients). The panel shall

-8-

select the auditor from the submissions and advise counsel thereof. The cost of the independent auditor selected shall be borne equally by the parties." (Id.)

21.    On April 7, 2004, the arbitration panel entered Pre-hearing Order No. 2. (See Def.'s Am. Stmt., Ex. Q.) According to the Order, "The Parties' submissions of suggested auditors, protocol and their correspondence illustrates the continued inability of the parties to agree and goes so far as to suggest that each party's suggested auditor listing is tainted. The material reviewed reflects that the parties have engaged in independent audit activities that may need to be supplemented." (Id.) Because the parties could not agree on a single audit firm, the evidence of witnesses from both firms proposed by them was presented to the arbitrators.

22.    RMS retained Africk/Chez P.C. to audit its claimed Project costs in the arbitration proceeding. RMS had engaged Africk/Chez in connection with the arbitration prior to entry of Pre-hearing Order #2, but for services unrelated to the audit of RMS' costs. RMS separately engaged Africk/Chez after entry of Pre-hearing Order #2 to audit RMS' costs.

23.    Pope retained Nykiel, Carline & Co. Ltd. to provide an audit of the Project.

### The Award

24.    Following an eight week trial, the arbitration panel issued a twenty-seven (27) page ruling dated November 30, 2006 (the "Award"). (See Def.'s Am. Stmt., Ex. B.)

25.    The arbitration panel found that Pope incurred "Project Costs" of $21,676,973, and received "Payments Distributed from Project Revenue Funds" of $19,658,356. (Id. at 6.)

26.    The arbitration panel found that RMS incurred "Project Costs" of $14,942,223, and received "Payments Distributed from Project Revenue Funds" of $15,084,687. (Id.)

27.    The arbitration panel awarded Pope $3,634,714 against RMS. (Id.) The source of funds to satisfy the Award were to come from the $3,072,550 in the Escrow Account as of June

30, 2006, plus interest accumulated to the date of satisfaction. (Id.) Any unsatisfied balance was to be paid by RMS. (Id.)

## *Allocation of Insurance Proceeds*

28.    Based on the provision of the Subcontract Agreement that "[a]ll revenues received by RMS and [Pope] as a result of or having to do with the Project from insurance companies or other parties shall be shared equally by the Parties after all costs are paid," (Def.'s Am. Stmt., Ex. E at 3 ¶ 8), "[t]he Panel concluded that the $1,000,000 insurance policy has benefitted Raymond and should be considered as part of the funds/benefit Raymond has received to date." (Def.'s Am. Stmt., Ex. B at 15.)

## *Determination of "Costs"*

29.    The arbitration panel found "that a significant component of the dispute between the two parties stems from the lack of definition of 'cost' in the Subcontract Agreement" between RMS and Pope (Id. at 21.)

30.    The arbitration panel found that "[t]here are varying opinions in the industry as to what makes up a cost," (id. at 22), and went on to discuss some of those definitions. It found that "neither RMS nor Pope provided convincing arguments at the hearings as to what the two parties bilaterally agreed to as to the meaning of 'cost' in their Agreement." (Id.)

31.    "Absent RMS and Pope defining 'cost' or delineating acceptable costs in the Agreement, the Panel had to make this determination as to costs that were reimbursable under the definition of 'cost.'" (Id.) In making that determination, the arbitration panel considered the Subcontract Agreement; the audit by Afrik/Chez on behalf of RMS and the audit by Nykiel, Carline & Co. Ltd. on behalf of Pope; Construction Industry Audit and Financial Publications; consistent treatment of costs for both RMS and Pope; documentary and testimonial evidence; and industry experience and expertise of the arbitration panel. (Id. at 22-23.)

32.     The arbitration panel attributed and determined that $579,752 of Pope Project Costs for

"owned equipment and tool cost," would be a "fair cost to project based on value added

to construction process." (Id. at 14.)

### *Other Undisputed Facts*

33.     Factual statements contained in the Conclusions of Law will stand as additional

Undisputed Facts.

## CONCLUSIONS OF LAW

### *Jurisdiction and Venue*

Core jurisdiction arises under 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(2)(B) because

this proceeding relates to a claim by Pope. Venue is proper in this District under 28 U.S.C.

§ 1409(a). The proceeding has been referred here by the District Court through its Internal

Operating Procedure 15(a).

### *Statutory Provisions*

The Illinois Arbitration Act and Federal Arbitration Act use similar statutory language for

the grounds on which awards may be reviewed:

Illinois Arbitration Act (710 ILCS 5/12):

> § 12. Vacating an award. (a) Upon application of a party, the court shall vacate an
> award where:
>
> > (1) *The award was procured by corruption, fraud or other undue
> > means;*
> >
> > (2) There was evident partiality by an arbitrator appointed as a
> > neutral or corruption in any one of the arbitrators or misconduct
> > prejudicing the rights of any party;
> >
> > (3) *The arbitrators exceeded their powers;*
> >
> > (4) The arbitrators refused to postpone the hearing upon sufficient
> > cause being shown therefor or refused to hear evidence material to
> > the controversy or otherwise so conducted the hearing, contrary to
> > the provisions of Section 5, as to prejudice substantially the rights
> > of a party; or
> >
> > (5) There was no arbitration agreement and the issue was not
> > adversely determined in proceedings under Section 2 and the party

did not participate in the arbitration hearing without raising the
objection; but the fact that the relief was such that it could not or
would not be granted by the circuit court is not ground for vacating
or refusing to confirm the award.

(Emphasis added).

Federal Arbitration Act (9 U.S.C.A. § 10):

§ 10. Same; vacation; grounds; rehearing.  (a) In any of the following cases the
United States court in and for the district wherein the award was made may make
an order vacating the award upon the application of any party to the arbitration -

(1) *where the award was procured by corruption, fraud, or undue
means*;

(2) where there was evident partiality or corruption in the
arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to
postpone the hearing, upon sufficient cause shown, or in refusing
to hear evidence pertinent and material to the controversy; or of
any other misbehavior by which the rights of any party have been
prejudiced; or

(4) *where the arbitrators exceeded their powers*, or so imperfectly
executed them that a mutual, final, and definite award upon the
subject matter submitted was not made.

(Emphasis added).

The provisions emphasized above are those in issue here, and they have been similarly

viewed by opinions out of Illinois and federal courts.

Under both of the Federal and Illinois Acts, grounds for vacating an arbitration award that

have been argued by the parties here require in pertinent part, a showing that:

"(1) The award was procured by corruption, fraud or other undue
means . . .

or

(3) The arbitrators exceeded their power . . .."

710 ILCS 5/12(a) (2007).   See also 9 U.S.C. § 10(a)(1) and (4) (2007).

No corruption or fraud by the arbitrators is asserted here.  Rather, it is argued by Plaintiff

that they exceeded their power and the Award was obtained by "undue means."

-12-

Illinois law provides for extremely limited judicial review. However, even if the FAA were to apply it is subject to the same standard.

### *Standard of Review*

Illinois courts have consistently held that the term "undue means" refers to some aspect of an arbitrator's decision or decision-making process which was arrived at by some manner which was unfair and beyond the normal process contemplated by the legislature, and generally requires an act having some character of fraud or corruption. See Drinane, 584 N.E.2d at 414; Hahn v. A.G. Becker Paribas, Inc., 518 N.E.2D 218 (Ill. App. Ct. 1987); Henley v. Economy Fire & Cas. Co., 505 N.E.2d 1091 (Ill. App. Ct. 1987); Seither & Cherry Co. v. Ill. Bank Bldg. Corp., 419 N.E.2d 940 (Ill. App. Ct. 1981).

As for the alternative requirement of exceeding powers of the arbitrator, "it is *presumed that an arbitrator did not exceed his powers*," and "where an award is challenged as invalid, the challenger has the burden of proving his contention by *clear, strong and convincing evidence.*" Burd, Inc. v. Stoneville Furniture Co., 479 N.E.2d 962, 965 (Ill. App. Ct. 1985) (citations omitted) (emphasis added).

"[J]udicial review of an arbitration panel's award is extremely limited." Carpenter Local 1027 v. Lee Lumber & Bldg. Material, 2 F.3d 796 (7th Cir. 1993). See also Holden v. Deloitte & Touche LLP, 390 F. Supp. 2d 752, 772 (N.D. Ill. 2005) (citing Yasuda Fire & Marine Ins. Co. v. Cont'l Cas. Co., 37 F.3d 345, 349 (7th Cir. 1994). Further, there is a presumption that an arbitrator acts within his or her authority. Rush v. Rockford Prods. Corp., 574 N.E.2d 636 (1991). As a Seventh Circuit opinion has noted, "[a]rbitrators do not act as junior varsity trial courts where subsequent appellate review is readily available to the losing party." Nat'l Wrecking Co. v. Int'l Bd. of Teamsters, 990 F.2d 957, 960 (7th Cir. 1993). Accordingly, "judicial review of an arbitration award is more limited than appellate review of a trial court's decision." Id.

In keeping with the great deference given to arbitral awards, courts have repeatedly held that "neither error nor clear error nor even gross error is a ground for vacating an award." IDS Life Ins. Co. v. Royal Alliance Assocs., Inc., 266 F.3d 645, 650 (7th Cir. 1001) (citing inter alia, Major League Baseball Players Assoc. v. Garvey, 532 U.S. 504, 509 (2001)). See also United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc., 484 U.S. 29 (1987); Flexible Mfg. Sys. Pty. Ltd. v. Super Prods. Corp., 86 F.3d 96, 100 (7th Cir. 1996) (quoting Gingiss Int'l. Inc. v. Bormet, 58 F.3d 328, 333 (7th Cir. 1995) (internal citations omitted) ("factual or legal errors by arbitrators - even clear or gross errors - do not authorize courts to annul awards."); Drinane v. State Far Mut. Auto. Ins. Co., 584 N.E.2d 410, 413 (Ill. App. Ct. 1991) ("The use of arbitration as a method of settling disputes is looked upon favorably by the courts and all reasonable presumptions indulged in favor of an arbitration award.") (citations omitted).

As a United States Supreme Court opinion held long ago:

> "Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes it should receive every encouragement from courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error either in law or fact. A contrary course would be a substitution of the judgment of the Chancellor in place of the judges chosen by the parties, and would made an award the commencement, not the end, of litigation."

Burchell v. Marsh, 58 U.S. 344, 349 (1855).

Arbitration is more expeditious than litigation mainly because it does not afford many of the procedural, evidentiary or appellate protections provided in litigation. See Hawrelak v. Marine Bank, Springfield, 735 N.E.2d 1066, 1070 (Ill. App. Ct. 2000). Therefore, "[t]he scope of judicial review of an arbitration award is nothing like the scope of an appellate court's review of a trial court's decision." Id. at 1068.

Deference is given to arbitration awards, because judicial modification would interfere with the parties' bargained for agreement regarding dispute resolution. Id. (citing Huey Corp., 649 N.E.2d at 1362). "Because the parties to an arbitration did not bargain for a judicial

-14-

determination, a reviewing court cannot set aside an arbitration award because of errors in judgment or mistakes of law or fact." Id.

A party seeking to vacate an arbitration award on the basis of the arbitrator's errors of law or fact asserted to satisfy the ground that the arbitrators exceeded their authority has a heavy burden. "*Gross* errors of judgment in law or *gross* mistakes of fact may be reviewable, but only if they are apparent upon the face of the award." Id. (citing Garver, 389 N.E.2d at 1183). (emphasis in original.) The validity of an award is not dependent upon issuance of reasons in support thereof, because, inter alia, it is "presumed that the arbitrator did not exceed his authority." American Invsco Realty, Inc. v. Century 21, 420 N.E.2d 692, 695 (Ill. App. Ct. 1981). In other words, faulty reasoning by the arbitrators as to facts or law is insufficient to vacate an arbitration award unless gross mistakes of fact or law appear on the face of the award. Therefore, a reviewing court should not consider upsetting the ruling based on the arbitration panel's erroneous reasoning in an opinion if one is provided. See Kalish v. Illinois Educ. Ass'n, 519 N.E.2d 1031, 1033 (Ill. App. Ct. 1988). The party seeking to vacate the arbitration award must provide a clear, strong and convincing showing that the arbitrators exceeded their authority; moreover, that party must demonstrate prejudice as a result of the arbitrators' actions. Canteen Corp. v. Former Foods, Inc., 606 N.E.2d 174, 182 (Ill. App. Ct. 1992).

One Illinois appellate court opinion has compared Garver standards to the requirement in opinions under the FAA that the party seeking review must show "manifest disregard of the law" in order to show that the arbitrators exceeded their authority. Huey Corp. 649 N.E.2d at 1363. "Review under that standard requires that the arbitrator deliberately disregarded what he knew to be the law." Id. (citing Eljer Mfg., Inc. v. Kowin Dev. Corp., 14 F.3d 1250, 1254 (7th Cir. 1994); Health Servs. Mgmt. Corp. v. Hughes, 975 F.2d 1253, 1267 (7th Cir. 1992)). According to the opinion in Huey Corp., the "manifest disregard of the law" standard is so high that it "provides an almost nonexistent standard of review." Id.

Some federal precedent has referred to the so-called "essence of the contract" standard of review. See United Steelworkers of America v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960)). According to the opinion in United Steelworkers, the arbitrator's "award is legitimate only so long as it draws its essence from the collective[-]bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." Id. However, the opinion in Huey Corp., interpreted the "essence of the contract" standard to provide a high standard of review similar to other high standards applied, because "the parties bargained for the arbitrator's view of the facts and meaning of the contract; the fact that the arbitrator misread the contract establishes no ground upon which the award can be set aside." 649 N.E.2d at 1364 (citing United Paperworkers Int'l Union v. Misco Inc., 484 U.S. 29, 38 (1987)). "The agreement of the parties fixes the conditions, limitations and restrictions to be observed by the arbitrator in making his award." Pillott v. Allstate Ins. Co., 363 N.E.2d 460, 464 (Ill. App. Ct. 1977) (citing Board of Educ. v. Champaign Educ. Ass'n, 304 N.E.2d 138, 142 (Ill. App. Ct. 1973)). However, absent express limitation by the parties, it is presumed that everything necessary to the ultimate decision, both as to fact and law, is within an arbitrator's authority. Kalish, 519 N.E.2d at 1033 (citing Farmers Ins. Group v. Harris, 279 N.E.2d 789, 790 (Ill. App. Ct. (1972)).

Finally, the opinion in Huey Corp. found pointedly that to apply an "arbitrary and capricious" standard that justifies vacating an award would be the same as judicial review and, therefore, is not permitted. 649 N.E.2d at 1364 (citations omitted).

### *Preemption Issue*

The arbitration agreement here was agreed to be governed by Illinois law and, therefore, the Uniform Arbitration Act as enacted by that State (the "Illinois Act") applies. See 710 ILCS 5/1 *et seq.* Under the Illinois Act, a court can only vacate an arbitration award based on statutory grounds. See Tim Huey Corp. v. Global Boiler & Mech., Inc., 649 N.E.2d 1358, 1361 (Ill. App. Ct. 1995) [hereinafter "Huey Corp."]. Should the Federal Arbitration Act (the "FAA") be

deemed to apply, that Act enables enforcement of arbitration agreements in contracts involving interstate commerce. See 9 U.S.C. § 2; Huey Corp., 649 N.E.2d at 1361. As earlier noted, the grounds for vacating an arbitration award under the Illinois Act and FAA on grounds pertinent here are virtually identical in that both statutes provide for vacating an award where the arbitrators exceeded their powers, 9 U.S.C. §10(a)(4); 710 ILCS 5/12(a)(3), or where the award was obtained by improper means 9 U.S.C. § 10(a)(1); 710 ILCS 5/12(a)(1).

Some precedents have dealt with efforts in litigation to add additional nonstatutory reasons under either Act for vacating an arbitration award. See, e.g., Huey Corp., 649 N.E.2d at 1361. In Huey Corp. the party seeking to vacate the award argued that the Federal Act preempted the parties' choice of state law to govern review of the award, so that the court could avail itself of asserted additional grounds not covered by state law. Id. The opinion rejected that argument, stating that, "even when federal law applies to an arbitration agreement, the [Federal Act] has never been construed to preempt all state law on arbitration.... At best, the Supreme Court's decisions support a conclusion that all state laws seeking to limit the use of the arbitral process are superseded by federal law." Id. at 1362 (quoting New England Energy Inc. v. Keystone Shipping Co., 855 F.2d 1, 4 (1st Cir. 1988)). See also Edstrom Indus. v. Companion Life Ins. Co., 516 F.3d 546, 549 (7th Cir. 2008) ("[T]he Supreme Court has held that parties can opt out of the federal act, provided the state arbitration statute does not contain provisions that would undermine the federal act's aim of facilitating the resolution of disputes involving maritime or interstate commerce by arbitration."). Therefore, the FAA does not preempt state law unless the state law conflicts with the policy in federal law favoring efficient dispute resolution. When the state chooses a standard of review that applies to vacating an arbitration award, that standard does not conflict with the federal policy. See Huey Corp., 649 N.E.2d at 1362.

### Edstrom Industries, Inc.

Two recent federal court opinions showed that review standards under the FAA are just as strict. The first was a recent opinion of the Seventh Circuit Court of Appeals that reversed an

arbitration award. According to one commentator, the question in <u>Edstrom Indus.</u> was the meaning of a phrase in the arbitration agreement providing that the arbitrator "shall strictly apply rules of [Wisconsin] law applicable thereto." Steven P. Garmina, Arbitrator Ordered to "Strictly" Apply Law, as Parties' Contract Provided, Chi. Daily. L. Bull., Apr. 16, 2008, at 1, 4. This analysis of the opinion missed the mark. According to the opinion itself,

> It shouldn't matter that the arbitrator was directed to "strictly" apply, rather than just apply, Wisconsin law. If parties add, in the provision designating what body of law shall apply to disputes referred to arbitration, "and we mean it!"- which is in essence what they did here - no federal policy requires the arbitrator to ignore that directive. Nowhere in the Federal Arbitration Act is it written that arbitrators are always to apply loosely whatever body of law the parties have specified to guide the arbitrators in resolving disputes.

516 F.3d at 550. Thus, the issue was not the effect of the word "strictly" but whether courts should give deference to an arbitrator's application and interpretation of the law. The opinion acknowledged the prevailing standard "that errors of law committed by arbitrators are not grounds for setting aside an arbitral award." <u>Id.</u> at 552. However, the opinion also held that the arbitrator had not merely applied Wisconsin law erroneously, but he . . .

> [s]eems not to have interpreted [the statute] at all but merely to have ignored it, which was inconsistent with the directive that he strictly apply Wisconsin law - and would have been inconsistent even if "strictly" had been omitted.

<u>Id.</u> at 552-53.

In reaching this conclusion, <u>Edstrom Indus.</u> relied on the arbitrator's issued opinion. <u>Id.</u> at 552. The decision further opined in a significant comment that "parties can alter the standard of judicial review of arbitral awards, and specifically can make it more searching [in that case by requiring Wisconsin law to apply], without running afoul of the [FAA] Act." 516 F.3d at 549. The latter concept was contradicted by the Supreme Court opinion in <u>Hall Street Assocs.</u> soon afterwards.

### *Hall Street Assocs., L.L.C. v. Mattel, Inc.*

A few weeks after Edstrom Indus. was decided, the Supreme Court decided Hall Street

Assocs., L.L.C. v. Mattel, Inc., 128 S. Ct. 1396 (2008).  Edstrom Indus. must now be read in light

of the Supreme Court's subsequent decision in Hall Street Assocs.

In Hall Street Assocs., the question was "whether statutory grounds for prompt vacatur

and modification [of an arbitration award] may be supplemented by contract."  Id. at 1400.  The

Court held "that [9 U.S.C.] §§ 10 and 11 respectively provide the FAA's exclusive grounds for

expedited vacatur and modification."  Id. at 1403.  The Court reasoned that allowing the parties

to expand judicial review would undermine the efficiency of arbitration, id. at 1405:

> Instead of fighting the text, it makes more sense to see the three provisions,
> §§ 9-11 [of the FAA], as substantiating a national policy favoring arbitration with
> just the limited review needed to maintain arbitration's essential virtue of
> resolving disputes straightaway.  Any other reading opens the door to the full-bore
> legal and evidentiary appeals that can "rende[r] informal arbitration merely a
> prelude to a more cumbersome and time-consuming judicial review process," ...
> and bring arbitration theory to grief in post-arbitration process.

The opinion briefly discussed whether "manifest disregard" of applicable law is a

standard for measuring whether an arbitrator exceeded authority.  In declining to interpret

"manifest disregard" as an additional nonstatutory basis for vacating an arbitration award, the

Court gave some indirect guidance: "We, when speaking as a Court, have merely taken the

Wilko language as we found it, without embellishment ... and now that its meaning is implicated,

we see no reason to accord it the significance that Hall Street urges."  Id. at 1404 (citations

omitted).

This comment referred to the earlier case of Wilko v. Swan, wherein the opinion held that

an arbitration provision in a margin agreement violated section 14 of the Securities Act of 1933.

See 346 U.S. 427, 435 (1953) *overruled by* Rodriguez de Quijas v. Shearson/American Exp.,

Inc., 490 U.S. 477, 484-85 (1989).  In dictum, the opinion in Wilko had reasoned under the FAA

"that the interpretations of the law by the arbitrators in contrast to manifest disregard are not

subject, in the federal courts, to judicial review for error in interpretation."  Id. at 436-37.  In

"taking the Wilko language as we found it" in Hall Street, the opinion accepted that reasoning. Thus, the issue of an arbitrator's "manifest disregard" of applicable law "merely refer[s] to the § 10 [statutory grounds under the FAA] collectively . . ." Hall Street Assocs., 128 S. Ct. at 1404 (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 656 (1985)) (additional citations omitted), or may be "shorthand for § 10(a)(3) or § 10(a)(4), the subsections authorizing vacatur when the arbitrators were 'guilty of misconduct' or 'exceeded their powers.'" Kyocera Corp. v. Prudential-Bache Trade Servs., Inc., 341 F.3d 987, 997 (9th Cir. 2003). In short "manifest disregard" can be shown only if statutory grounds for vacatur under the FAA can be shown.

Until Hall Street was decided, the Seventh Circuit panel opinion in Edstrom Indus. could have been read to expand the standard of review for vacating an arbitration award. However, after Hall Street, the Edstrom Indus. opinion must be read more narrowly. Under this reading, the arbitrator's complete disregard of applicable law found by the Edstrom Indus. opinion was determined from the face of the award and that justified reversal under accepted standards. Edstrom Indus. must therefore be read as limited to those facts.

Hall Street Assocs. did not shed new light on whether or how to apply the "manifest disregard of the law" standard. It just made clear that the FAA provides the standard for reviewing an arbitration award, and that parties cannot contract for a different standard. It thereby was inconsistent with the statement in Edstrom Indus. that "parties can alter the standard of judicial review of arbitral awards, and specifically can make it more searching . . .." 516 F.3d at 549.

### *The Standard to be Applied Here*

In terms of promoting the efficient and expeditious resolution of disputes, which is the public policy behind both the Illinois Act and FAA, deference to the arbitration ruling is clearly required by the standard to be applied here under either Act. As pointed out in Huey Corp.

> We see no principled way to inject ourselves into this case, to correct an award of
> damages we suspect is insufficient, where the parties have exercised their right to

select an alternate forum.  That is not to say that we are satisfied with the
arbitrators' award in this case.  If a jury had made this award, we might well
reverse it.  A new trial is appropriate when the damages awarded are manifestly
inadequate, it is clear proved elements of damages have been ignored, or the
amount awarded bears no reasonable relationship to the loss suffered by the
plaintiff.  We should not concoct some reason to review arbitration awards we do
not like, however, at the same time stating that we will not set aside an award
because of errors in judgment or mistakes of law or fact.  We cannot say that this
award was made in bad faith, that the arbitrators were guilty of fraud, or that the
arbitrators clearly chose not to follow the law.

649 N.E.2d at 1364 (citations omitted).

That reasoning, along with similar reasoning in other opinions, provides the guide for

review of the instant case:  Whether it is shown that the arbitrators exceeded their authority

through demonstration from the face of the award that they chose not to follow applicable law

and thereby "exceeded their power," or otherwise are shown to have acted by "undue means."

On Pope's Motion for Summary Judgment, it has the burden of showing that there is no triable

issue of fact from which Plaintiff can meet its burden to prevail on one of those issues.  However,

even if Plaintiff can show that the arbitrators made some mistake in reciting facts or reasoning,

that is not sufficient to meet its burden.

## SUMMARY JUDGMENT STANDARDS

Summary judgment should be granted when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c), as adopted in Fed. R. Bankr. P. 7056; In re Kmart Corp.,

310 B.R. 107, 117-18 (Bankr. N.D. Ill. 2004)(citations omitted); Lexington Ins. Co. v. Rugg &

Knopp, 165 F.3d 1087, 1090 (7th Cir. 1999) (citing Celotex Corp. v. Catrett, 477 U.S. 317

(1986)).  See also In re Kmart Corp., 293 B.R. 905, 909 (Bankr. N.D. Ill. 2003) (citations

omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or

unnecessary [to the outcome of the summary judgment motion] will not be counted." In re

Kmart Corp., 293 B.R. at 908-09 (citing Fritcher v. Health Care Servo Corp., 301 F.3d 811, 815

(7th Cir. 2002) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986))) (emphasis added).  Mere speculation or conjecture will not defeat a summary judgment motion; nor will a mere scintilla of evidence in support of the opponent's position.  <u>Tolle v. Carroll Touch, Inc.</u>, 23 F.3d 174, 178 (7th Cir. 1994).

Here, while Plaintiff disputes certain facts asserted by Pope, it does not show disputed facts that prevent summary judgment for Pope.  In this regard, Plaintiff failed to demonstrate specific, material facts which show either that the Award was procured by "undue means" or that the Arbitration Panel arbitrators "exceeded their powers."

### *Plaintiff Did Not Demonstrate That The Award Was Procured by "Undue Means" or That The Arbitration Panel Arbitrators "Exceeded Their Powers"*

A.   <u>Plaintiff's Count I Must Fail</u>

RMS argues that "[t]here is and never was a '$1,000,000 insurance policy' for [RMS] and there  was no evidence introduced during the Arbitration hearing concerning [RMS's] insurance."  (<u>See</u> Amended Petition, ¶ 33.)  Based upon the trial evidence, the Panel has reason to conclude that there were in fact insurance funds from a Project policy which benefitted RMS only, not Pope.  Pursuant to the Subcontract Agreement, "All revenue received by RMS and GC [Pope] as a result of or having to do with the Project from insurance companies or other parties shall be shared equally by the Parties after all costs are paid."  (Amended Petition, Exhibit A, Subcontract Agreement, Note 4, section 8.)  Based upon this contract provision, and the testimony adduced at trial, the Panel concluded that the $1 million paid from an insurance policy obtained for the Project were Project funds that should have been included in the accounting for Project revenue.

Even if the Panel erred in defining "project Revenue," that would not be a ruling in excess of its powers or a ruling by undue means.  Plaintiff attempts here to relitigate that issue.  It also attempts to rebut the Panel's ruling that the $1 million paid by the insurance company did

benefit. These are arguments that the arbitrators erred in their reasoning, not that they exceeded their powers. Moreover, the Plaintiff's argument is itself not accurate for several reasons:

(a)    Plaintiff s argument that because "there was no court reporter in the arbitration" and that therefore the testimony of Jean Chidley was "not testimony" is misplaced. Jean Chidley was sworn in by an arbitrator and then she read into the record excerpts from several binders of documents -- documents which Pope now relies upon. (See Exhibit 1, Votava Supplemental Affidavit.) Plaintiff's own submissions to the Arbitration Panel acknowledged that Doug and Jean Chidley testified under oath and that Plaintiff presented sworn testimony. (See Votava Supplemental Affidavit and its attached Exhibit B.)

(b)    Jean Chidley testified that the actual amount paid to Schiff Hardin by Plaintiff's insurer was $1 million. Ms. Chidley testified that $1 million was paid by Plaintiff's insurer to Schiff Hardin.

(c)    Jean Chidley testified that "[t]he approximately $1 million Ms. Votava identified as 'project receipts' are the defense costs that Plaintiff's insurer paid directly to Schiff Hardin to defend Plaintiff against Pope's more that $9 million in claims." (See Votava Supplemental Affidavit, and its attached Exhibit A).

To the extent that Plaintiff now seeks by presenting Ms. Chidley's affidavit to claim that "no evidence" was presented on those matters, it seeks to contradict evidence actually presented under oath to the Panel and thus create a fact issue to bar summary judgment. That tactic cannot succeed. A party cannot prevail on a motion for summary judgment by "submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." Adusumilli v. City of Chicago, 164 F.3d 353, 360 (7th Cir. 1998).

The Arbitration Panel, after a review of the evidence, had grounds to conclude that Plaintiff received and benefitted from the $1 million paid to its lawyers at Schiff Hardin.

According to Plaintiff, because there was a disputed fact issue in the arbitration as to whether this $1 million was "revenue," it asserts that "[t]hese disputed, material facts must be taken as true and all inferences concerning these facts must be drawn in Plaintiff s favor for purposes of this Motion." (See Plaintiff's Response in Opposition at 7.) Plaintiff's position utterly confuses its burden to upset an arbitration award. Indeed, even if the arbitrators made an

error of fact or law in ruling concerning the $1 million, that would not be a basis for overturning the award. IDS Life Ins. Co. v. Royal Alliance Assocs., Inc., 266 F.3d 645, 650 (7th Cir. 2001) (citing, inter alia, Major League Baseball Players Assoc. v. Garvey, 532 U.S. 504, 509 (2001)). See also Flexible Mfg. Sys. Pty. Ltd. v. Super Prods. Corp., 86 F.3d 96, 100 (7th Cir. 1996) (quoting Gingiss Int'l, Inc. v. Bormet, 58 F.3d 328, 333 (7th Cir. 1995) (additional citations omitted)). ("Factual or legal errors by arbitrators - even clear or gross errors - do not authorize courts to annul awards"). Rather, only material facts related to whether the Award was procured by "undue means" or related to whether the Arbitration Panel "exceeded their powers," if there were any such facts, would be relevant to Pope's Motion.

Here, Plaintiff has made no showing that the Arbitration Panel's ruling regarding the $1 million paid by the insurer to Schiff Hardin was somehow procured by "undue means," nor has Plaintiff shown that the Arbitration Panel members "exceeded their powers."

Finally, Plaintiff argues (Pltf. Mem. at p. 9) that if "the insurance money was "revenue," then paragraph 8 of the Subcontract required the Panel to recognize the same $1,000,000 as an RMS cost." Since that was not recognized as a cost, Plaintiff argues that the Panel violated "the power afforded to the Panel in the Subcontract and it appears on the face of the Award." Plaintiff did not quote the provision relied on.

The Subcontract was submitted as Exhibit E to Pope's Amended Statement of Material Facts. Paragraph 8 thereof pertains to Change Orders, in which the following is stated. "All revenues received by RMS and GC as a result of or having to do with the Project from insurance companies or other parties shall be shared equally by the parties after all costs are paid." That relates to the final accounting to be had between the parties as to revenue and costs. Plaintiff's argument here goes to the issue whether the panel made a mistake in that accounting, but does not show that the Panel exceeded its authority. An error, if shown, does not show abuse of authority that warrants vacatur of the Award.

-24-

B.    Count II - Plaintiff Fails To Show How The Arbitration Panel
      "Exceeded Its Powers" When It Determined What Were Project "Costs"

In discussion of Count II, Plaintiff asserts that the Arbitration Panel's definition of "costs"
was improper, and that as a result, certain equipment costs charged by Pope should not have been
included in the Award.

The "Construction Equipment Issue," as RMS defines it, relates to a cost in the amount of
$579,752 that was awarded as part of "Pope Project Costs" for "owned equipment and tool cost
as determined by Panel." (See the Award at pg. 14, Exhibit B to Amended Petition to Vacate.)
The Panel explained that the amount was "[d]etermined by panel as fair cost to project based on
value added to construction process." Id. This amount was less then the cost for construction
equipment and tools claimed by Pope in the arbitration. The reduction itself shows that the Panel
thoroughly evaluated all costs submitted in the arbitration, and awarded those amounts it
determined to be valid costs. The Panel allowed Pope $579,752 for equipment and tools that
Pope owned and used on the Project. The Panel did not accept the RMS position now implied
that Pope should have used its own equipment and tools at the construction site for the Project,
but without cost to the Project.

There was no definition of "project costs" in the Subcontract. Relying on its experience
in the construction industry, and the testimony of experts and auditors, the Panel determined
what were to be included as "costs." That is the sort of judgment that arbitrators make and is
illustrative of the reason why parties choose experienced arbitrators to apply industry standards
instead of trying to educate judges and jurors. In determining "project costs," the Panel relied on
various resources, including: (1) the AICPA Audit and Accounting Guide, Construction
Contractors, with Conforming Changes as of May 1, 2005; (2) the Accounting Research Bulletin
43; (3) the FAS 151: Inventory Costs and amendment of RB No. 43; Chapter 4; (4) the
Accounting Terminology Bulletin No. 2; and (5) the Statement of Auditing Standards, AICPA.
(See Exhibit B to Amended Petition to Vacate Arbitration Award.) The Panel issued its Award

based on its definition of "project costs," and "was attentive to being consistent with their treatment of specific categories of costs for Raymond and Pope." Id. at 13.

In relying on the cited sources, it cannot be concluded that the Panel "exceeded their powers."

C.    Count III -The Arbitration Panel Did Not Exceed Its Authority
When It Allowed Two Separate Auditors To Be Used; Further,
Even Assuming *Arguendo* That The Arbitration Panel
Exceeded Its Powers, Plaintiff Has Waived Any Objection

The Panel did not "exceed their powers" when the Panel entered an order requiring the use of two separate auditors. Paragraph 7 of the Subcontract stated that "in the event that either Party at any time believes that an independent audit of the Project's profitability is warranted, then the Parties agree to engage a firm for this purpose." Paragraph 11 of the Subcontract stated that "[a]ny term of this Agreement may be modified or deleted, but only if the modification or deletion is put in writing and signed by the parties." (See Exhibit A to Amended Petition to Vacate Arbitration Award). They did not agree to what firm should testify and did not agree to modify the contract in this regard. But by each submitting a list of possible different auditors in compliance with the Panel's February 18, 2004 case management order, Plaintiff and Pope both implicitly agreed to the modification of paragraph 7 of the Subcontract so as to allow more than one auditor to testify. The panel was required to hear from an independent auditor because the parties agreed that they wanted that. Since the parties could not agree on which auditor would be heard, it made very good sense for the Panel to hear from one auditor chosen by each party, and derive understanding from both. That procedural decision at trial can hardly be considered an abusive act in excess of authority.

Further, Plaintiff did not raise any objection regarding testimony by two separate auditors until after the Panel issued its Award, so any objection was waived during trial. Ganton Techs., Inc. v. Int'l Union, United Auto., Aerospace & Agricultural Implement Workers of Am., Local 627, 358 F.3d 459, 462 (7th Cir. 2004) ("The failure to pose an available argument to the

-26-

arbitrator waives that argument in collateral proceedings to enforce or vacate the arbitration award.").

Accordingly, Plaintiff's Count III must fail.

D.    Count IV -Plaintiff Cannot Argue That The Award
      Award Should Be Vacated Because It Lacked Well
      Reasoned Calculation of Raymond's Project Costs

Plaintiff's argument that the Award should be vacated because the panel violated its obligation to provide a reasoned award is clearly wrong and in contradiction to established law. Wachovia Securities, LLC v. Barnes, 2006 U.S. Dist. LEXIS 34020 (N.D. Ill. 2006) (a court may not vacate an arbitration award on the grounds that it contains no explanation for its decision); Bailick v. Patterson Travis, Inc., 2001 U.S. Dist. LEXIS 3783 (N.D. Ill. 2001); Olde Discount Corp. v. Young, 113 F. Supp. 2d 1229, 1234 (N.D. Ill. 2000) ("The general presumption in favor of arbitration awards compels courts to affirm even the most general awards."). Eljer Mfg. v. Kowin Dev. Corp., 14 F.3d 1250, 1254 (7th Cir. 1994) ("[A]n arbitrator is simply not required to state the reason for his decision" because "[s]uch a requirement would serve only to perpetuate the delay and expense which arbitration is meant to combat."); Shearson Hayden Stone, Inc. v. Liang, 653 F.2d 310 (7th Cir. 1981);

Further, the Panel's extensive rationale for the various components of its Award was fully explained.

Plaintiff's argument under Count IV, alleging "Insufficient Basis for Calculating Raymond's Project Costs," specifies two grounds: the "Labor Burden Error" and the "Unreasoned Award Elements."

The asserted Labor Burden Error argument is based upon there being no identical and matching number in Africk Chez's ("AC") work papers in the amount of $1,133,410 and no category entitled "labor burdens for direct labor". (See Amended Petition, 1173, 74.)

The Award allowed the full amount of direct labor requested by RMS, $2,699,463, which included another Raymond entity, Doyen and Associates. RMS was also awarded the full

-27-

amount it requested in materials ($8,875,619) as well as Subcontractor costs ($1,695,169). (See Award, p. 15, Exhibit B to Amended Petition to Vacate.) RMS was not however, awarded the total amount of "Overhead Allocation" it claimed as costs of the Project. The total amount of Overhead Allocation requested by RMS was $2,859,684. (See AC Project Cost Report, Amended Petition, Exhibit I. at 3). As per the statements made by AC, the $2.8 million was not a dollar for dollar accounting of the costs actually expended by RMS. AC described the method for calculating overhead as follows:

> The allocation of overhead is calculated from costs incurred by the Raymond Professional Group that are not directly related to projects performed for its clients. The Company overhead cost charged to the project is in an amount that most closely relates to the actual costs incurred by the organization. . . Overhead is allocated based upon actual direct labor dollars incurred because management considers direct labor to be the best available measure.

(See AC Project Cost Report, Amended Petition, Exhibit I. at 5.) AC did not specifically audit the payroll burden, and its quantification was rejected by the Panel. As the Panel Award stated: "The Panel is of the opinion that a significant component of the dispute between the two parties stems from the lack of definition of 'cost' in the Subcontract Agreement between RMS and Pope." (See the Award at p. 21, Exhibit B to Amended Petition to Vacate.) The Panel discussed the varying opinions in the industry as to what makes up Project cost. Id. The Panel then explained its method used for evaluating costs:

> Absent RMS and Pope defining 'cost' or delineating acceptable costs in the Agreement, the Panel had to make this determination as to costs that were reimbursable under the definition of 'costs.' The Panel considered the following in making this determination:
>
> 1.    The Subcontract Agreement between Raymond (RMS) and Pope.
>
> 2.    Audits (and supporting testimony conducted by Africk Chez [sic] P.C. [for Raymond] and Nykiel, Carlin [sic] & Co. Ltd. [for Pope] as directed by the Panel.
>
> 3.    Construction Industry Audit and financial Publications.

4.    Consistent treatment of cost treatment for both Raymond and
Pope.

5.    Documents and testimony entered into evidence.

6.    Industry experience and expertise of the Panel members.

(See the Award at 22-23, Exhibit B to Amended Petition to Vacate.)

It cannot be said that the reasoning on this issue exceeded authority or was otherwise improper.

RMS also disputes two of its claimed costs disallowed by the Panel and describes them as "Unreasoned Award Elements." However, the Panel provided reasons for the deducted and reduced amounts. It explained the first deduction of $44,207 and stated "Minus home office personnel disallowed" and "Costs and burdens deducted for non-project personnel." (See the Award at 15 line item 5, Exhibit B to Amended Petition to Vacate.) It made perfect sense to disallow home office personnel not working on the Project, since costs to be allowed were for the Project in issue, not overhead.

AC had explained the Project Costs as follows: "The Company's project costs of the AES Medina Valley Cogeneration Plant are included in this schedule. In addition, home office overhead has been allocated to this project." ( Amended Petition Exhibit L, Note 2.)  The Panel had a legitimate reason to deduct what AC identified as overhead, since overhead was not a Project cost.

The Panel also reduced  to $582,769 a category claimed by RMS as "other costs." The Award clearly explained that it did not allow the following: "Costs not included are allocated costs, related costs, costs related to Pope default, and arbitration costs." (Award, at 15 line item 6, Exhibit B to Amended Petition to Vacate). This ruling was fully explained.

The fact that the Panel's decision provided some reasoning is more than is required by law and is sufficient grounds for denying the Plaintiff's suit to overturn the award.  Plaintiff showed no material facts in dispute or grounds demonstrating that the Arbitration Panel "exceeded their powers" or that the Award was procured by "undue means."

E.    Count V -It Was Not Demonstrated That Pope Hid Documents

Plaintiff asserts that the Award should be vacated "as a result of Pope's concealment of important project records during the arbitration," including the January 30, 2003 Final Lien Waiver ("03 Lien Waiver"). Neither the '03 Lien Waiver or the other preceding lien waivers were at issue in the Arbitration proceeding, as the Arbitration proceeding was merely an audit of Project costs. Jean Chidley admitted in her sworn testimony that Plaintiff knew of the '03 Lien Waiver, and it was this lien waiver on which AFS relied when making the $2.5 million transfer to the Account. (See Exhibit 1, Votava Supplemental Affidavit.)

Plaintiff relied unsuccessfully upon asserted nondisclosure of documents in the arbitration proceeding itself. There, Plaintiff moved to strike certain documents based on contention that they were not earlier produced by Pope. That motion was denied. However, the purported lack of '03 Lien Waiver was not even part of that motion.

If Plaintiff had any concerns regarding its purported lack of the '03 Lien Waiver, it did not assert them by motion in the arbitration proceeding. Therefore, such objection was waived. See Ganton Techs., Inc., 358 F.3d at 462.

Even assuming *arguendo* that Plaintiff's assertions were true, it failed to demonstrate how the lien waiver was a key issue in the Arbitration Proceeding, or how Plaintiff's lack of the '03 Final Lien Waiver materially impacted the trial or Award. Plaintiff certainly does not demonstrate that the Arbitration Panel "exceeded their powers" or that the Award was procured by "undue means."

## CONCLUSION

Based on the foregoing Pope's Motion for Summary Judgment is allowed and Summary Judgment in its favor will separately be entered.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Entered this 19th day of November 2008.

## CERTIFICATE OF SERVICE

I, Dorothy Clay certify that on November 19, 2008, I caused to be mailed by United

States first class mail copies of the foregoing Memorandum Opinion to the following:

Jason M. Torf, Esq.
Eugene J. Geekie, Jr., Esq.
David A. Howard, Esq.
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606
Counsel for Debtors/Plaintiff

Susan K. Gummow, Esq.
John F. O'Brien, Esq.
Clausen Miller, P.C.
10 South LaSalle Street
Chicago, IL 60603
Counsel for William A. Pope Company

Harley J. Goldstein, Esq.
Sven T. Nylen, Esq.
Bell, Boyd & Lloyd LLP
70 West Madison Street
Suite 3100
Chicago, IL 60602
Official Committee of Unsecured Creditors

Gretchen Silver, Esq.
Office of the U.S. Trustee
219 South Dearborn Street
Suite 873
Chicago, IL 60604

_Dorothy Clay_
Secretary/Deputy Clerk