### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| RAYMOND PROFESSIONAL GROUP, INC. | ) | Bankruptcy No. 06 B 16748 |
| Debtor. | ) | |
| | ) | |
| RAYMOND MANAGEMENT SERVICES, | ) | |
| INCORPORATED n/k/a RAYMOND | ) | |
| PROFESSIONAL GROUP - DESIGN/BUILD, | ) | |
| INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary No. 07 A 00137 |
| v. | ) | |
| | ) | |
| WILLIAM A. POPE COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

### SUPPLEMENT TO MEMORANDUM OPINION ON
### DEFENDANT POPE'S MOTION FOR SUMMARY JUDGMENT

In the Memorandum Opinion of November 19, 2008, Pope's Motion for Summary

Judgment herein to confirm the Arbitration Award in issue (the "Award") was allowed. (Docket

No. 56.) Pope's counsel was then ordered to present a proposed Final Judgment Order. The

draft proposed by counsel did not provide an adjudication of issues decided by the Award, so an

Order was drafted in chambers and entered. (Docket No.59.) That Order was vacated by

agreement after inquiry to the lawyers in open court. During that inquiry, counsel for Pope

argued that the Final Judgment should adjudicate that the Arbitration Award gave Pope

ownership rights in funds deposited into the current account referred to in the Award as "escrow

account", an ownership issue now on trial in separate Adversary proceeding No. 07-A-00639.

While no such order was presented by Pope's lawyers, their oral argument should be dealt

with in this Supplement before the Amended Final Judgment Order is entered.

The Final Judgment here must deal only with the issues tried and adjudicated by the

Arbitrators. Those issues and the Arbitrators' rulings thereon in their Award were expressed in

the first six pages of the Award, supplemented by notes and computations in the following twenty-one pages. The entire Award is appended as an exhibit hereto.

It is clear that the first ruling in the Award was that the arbitration demand of Raymond Management Services Incorporated asserting many claims concerning work performance and allocation of monies paid by the owner was entirely denied.

The second adjudication is the point now at issue. It resolved the Counterclaim of William A. Pope Company. That Counterclaim requested "an order directing RMS [Raymond Management Services, Incorporated] to comply with the terms of an Interim Settlement Agreement entered into between the parties dated September 26, 2001 . . . ." It also asserted dollar claims on several performance related grounds. The Arbitrators awarded and adjudicated on that counterclaim a "Finding and Judgment" for William A. Pope Company as Counter-Claimant in the amount of $3,634,714, against Raymond Management Services Incorporated, the Counter-Respondent. Further claims by Pope were denied, and Motions for Sanctions not relevant here were also adjudicated.

On page 3 of the Award an asterisk after the amount of dollar judgment added the following comment:

"* see page 6 - Source of Funds to be paid Pope with Notes 16 and 17."

On page 6 of the Award is found a chart summarizing the basis for the dollar award, ending with the entry "Total Due Pope $3,634,714." There followed a section entitled "Source of Funds to be paid Pope," which recited the following:

"Funds Available in Escrow Account through 6/30/06      $3,672,550  Note 16

Additional Funds Due Pope*                              $ 562,164*  Note 17

*Note: The additional funds due Pope are to be funded by the accumulated interest in the Escrow account as of the date of the satisfaction; any unsatisfied balance to be paid by Raymond to Pope."

Notes 16 and 17 referred to are found on page 16 of the Award. Those notes read as follows:

- 2 -

"Note 16:
Per bank statement for the escrow account provided to the Panel by Raymond.

Note 17:
The total amount to be paid Pope is $3,634,714. The funds available in the
Escrow Account Balance through 6/30/06 were $3,072,550. The additional funds
due Pope are to be funded by the additional interest in the Escrow account as of
the date of the satisfaction; any unsatisfied balance to be paid by Raymond to
Pope."

The "Escrow Account" referred to in Note 17 is a bank account requiring the joint

signature of officers of Pope and Raymond for withdrawal or use of any money deposited therein.

The ownership of that account is being litigated in the separate Adversary proceeding No. 07-A-

00639 now on trial. While Pope contends therein that the account is indeed an escrow account

owned by it, Raymond contests that. Other issues over who owns the account are also in

litigation.

Pope now argues that the Arbitration Award involved in this proceeding was a

determination in effect that the account in issue belongs to it, and such should be reflected in the

Final Judgment. Pope's argument is essentially that, because the Award ruled that Raymond

should pay it whatever was deposited in the account, therefore Pope must own the account.

To the contrary, neither party to the Arbitration sought or received determination as to

ownership of the account in issue. What Pope won was most of what it sought, an order

enforcing a certain Interim Settlement Agreement entered into between the parties and

determination of the amount due to it. While the Arbitrators referred to monies to be paid both

from the disputed account and from Raymond's resources, the Arbitrators and their Award did

not determine, and were not asked to determine, ownership rights in the account. They

adjudicated a contractual obligation of Raymond to pay a defined amount, and a contractual

obligation to pay that debt partly out of the disputed account and partly from other sources.

The entire Award was twenty-seven pages long, and at no part can it be said that the issue

of account ownership was either before the Panel or determined by it.

- 3 -

Following entry of the Award, Raymond filed its related Bankruptcy case. The Award being confirmed comprises a liquidated dollar claim against the bankruptcy estate and an entitlement to recovery thereof. But there remains in bankruptcy the issue whether the disputed account represents property of Pope that can satisfy part of Raymond's debt, or is property of the bankruptcy estate against which claims of all creditors can apply.

Accordingly, the Amended Final Judgment will not enter the adjudication of ownership now requested by Pope's lawyers.

Instead, the Judgment will entirely confirm all adjudications of the Award, and not go beyond what the Award determined.

ENTER:

_____
Jack B. Schmetterer
United States Bankruptcy Judge

Entered this 23rd day of December 2008.

- 4 -



## AMERICAN ARBITRATION ASSOCIATION

### CONSTRUCTION INDUSTRY ARBITRATION TRIBUNAL

In the Matter of the Arbitration between

Re:    51 Y 110 01689 03
       Raymond Management Services, Incorporated
                        Vs.
       William A. Pope Company

Matthew E. Halteman, Case Manager

### AWARD

WE, THE UNDERSIGNED ARBITRATORS having been designated in accordance with
Paragraph 11 of the Terms and Conditions of the Subcontract Agreement between the
parties dated September 12, 2000 and by reference Article 21 of the Contract of AES
Medina Valley Cogen, L.L.C. ("AES") and Raymond Management Service, Incorporated
dated September 12, 2000, and having been duly sworn and having duly heard the proofs
and allegations of the parties hereby AWARD as follows:

### Demand of Raymond Management Services, Incorporated

Claimant Raymond Management Services, Incorporated ("RMS") filed a Demand for
Arbitration dated 9/9/03 which requested an audit of Respondent William A. Pope
Company's ("Pope") costs for the project and, as part of the Award, an allocation
between the parties of escrowed funds paid by AES. By letter dated 10/22/04 Claimant
filed a Statement of Performance Claims, Nos. 1 through 10, against the Respondent.
Counsel's letter dated 3/10/06 withdrew Claims Nos. 2 through 10 and affirmed that
Claimant would only present evidence to sustain its Claim No. 1 "Weld Repair Failure
Costs" which was addressed at the arbitration hearing.

Based on the evidence presented the following findings and judgment is entered:

Finding and Judgment for

    William A. Pope Company, Respondent

                    Vs.

    Raymond Management Services, Incorporated, Claimant    **Recovery Denied**





51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 2 of 27

### Counterclaim of William A. Pope Company

William A. Pope Company, as Respondent/Counter Claimant, filed an Answering Statement and Counterclaim dated 11/11/03 which requested an order directing RMS to comply with the terms of an Interim Settlement Agreement entered into between the parties dated 9/26/01 and, if the Panel decides that claims can be asserted by the parties, the Counter Claimant claims damages were caused by Counter Respondent's late and erroneous engineering, project mismanagement and cost overruns. By letter dated 10/22/04 Counter Claimant filed a Statement of Performance Based Claims, Nos. 1 through 30. On 3/22/05 Counter Claimant filed a Summary Statement of Performance Based Claims, Nos. 1 through 28. At the arbitration, during the presentation of Counter Claimant's evidence, Claim No. 16 was withdrawn.

The Pope claims addressed at the hearing were:

No. 1   "Rework requested by RMS through Rapid Memos"
No. 2   "Rework requested by RMS and performed by Illinois Piping Corporation the weeks of 10/1/01 and 11/21/01"
No. 3   "Steam Turbine drains and seal replacement"
No. 4   "BB Building – Drip pan extension and fan motor sheaves replacement
No. 5   "BB Building – Revise cooling water piping"
No. 6   "30# Natural Gas to HRSG's"
No. 7   "Revisions to the Condensate sample piping"
No. 8   "Steam Trap Replacement on 250# Steam Header"
No. 9   "Replace Gas Ball Valves"
No. 10  "Remove and replace DCS Ethernet Cable"
No. 11  "Piping Weld Upgrading – to an elevated degree of examination and acceptance standards of pipe weldments
No. 12  "Butler Building Modifications"
No. 13  "Revision to the Deaerator and Boiler Feed Pump Assembly"
No. 14  "Novaspect – Resolve problems & provide solutions for Steam Control Valves and Desuperheaters"
No. 15  "Changed Deaerator Feed Pumps from Horizontal to Vertical Can Pumps"
No. 17  "Lighting Protection was not specified/required"
No. 18  "BB Building Chilled Water piping anchors and guides"
No. 19  "Return Cooling Tower Pumps to manufacture for modification"
No. 20  "Asphalt paving in lieu of gravel for roadway around Cogan Facility"
No. 21  "Additional office/Washroom Build-out"
No. 22  "Providing Access to Various Items"



51 Y 110 01689 03
Raymond Management Services, Incorporated
                Vs
William A. Pope Company
Page 3 of 27

No. 23   "Cooling Tower, static screen trolley beam and hoist"
No. 24   "Equipment & Specialties Cost Overruns"
No. 25   "RMS failed to process Contract Change Notices (CCN)"
No. 26   "RMS Delays and Extended Job Duration"
No. 27   "Pope's Start Up Support & RMS' Vendor Support Overruns"
No. 28   "Engineering & Project Management Overruns"

Based on the evidence presented the following findings and judgment is entered:

Finding and Judgment for

          William A. Pope Company, Counter Claimant
                   in the amount of                        $ 3,634,714.00 *

                          Vs.

          Raymond Management Services, Incorporated,
                     Counter Respondent

          *see page 6 "SOURCE OF FUNDS TO BE PAID POPE"
              with Notes 16 & 17

## Motion for Sanctions of Raymond Management Services, Incorporated

After the conclusion of the evidentiary presentation Raymond Management Services
Incorporated ("RMS"), as Claimant/Counter Respondent, filed the captioned Motion on
8/31/06 addressing:

1. The William A. Pope Company ("Pope") Motion for Pre-hearing Disposition i.e.
   a Motion for Summary Judgment of several issues filed on 6/24/04,
2. The 28 Claims Pope stated in its Counterclaim versus RMS, and
3. RMS filed a Motion to Strike/Remove certain Pope exhibits presented at the
   hearing.

Pope filed its Response on 10/13/06 and RMS filed its Reply on 10/20/06.



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 4 of 27

After review of the relevant documents and the arguments of counsel the Panel rules as follows:

1. Raymond Management Services, Incorporated Motion for Sanctions versus William A. Pope Company relative to its Motion for Pre-hearing Disposition i.e. Motion for Summary Judgment is DENIED.

The Pope Motion for Pre-hearing Disposition filed 6/28/04 identified four issues. Three of the issues were directed to the 9/26/04 Interim Settlement Agreement and the disbursal of funds from the Project Account. The fourth requested a finding that the parties were "contractually prohibited" from bringing Performance Based Claims against each other with respect to the Project.

The RMS Response filed 7/28/04 specifically identified an amount paid to Pope after the Interim Settlement Agreement was executed which had not been identified in the Pope Motion. RMS also requested a finding that the parties are permitted to file Performance Based Claims arising from a party's "culpable negligence, bad faith or fraud".



Pope's 8/19/04 Reply acknowledged the payment recited by RMS in its Response and further corrected, to a net amount, the claimed amount due and owing Pope under the Interim Settlement Agreement and restated its position that the parties should not be allowed to raise Performance Based Claims.

Pre-hearing Order No. 5 issued after the 9/31/04 Conference Call, recited: that Pope's Motion was DENIED as to all four issues raised and that the parties had to 10/22/04 to file their Statement of Claims specifying items of alleged negligent performance and resulting damages. Both parties filed Statements of Claims.

2. Raymond Management Services, Incorporated Motion for Sanctions versus William A. Pope Company relative to Pope's Presentation of Claims that Lack Merit is DENIED.

3. Raymond Management Services, Incorporated Motion to Strike/Remove Certain William A. Pope Company Exhibits Produced During the Arbitration Hearing is DENIED.



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 5 of 27

### Computation of Awards

The Panel has reviewed:

- The AICPA Audit and Accounting Guide for Construction Contractors, paragraph 72, and its application of general principles in accounting consistent with generally accepted principles for costs of construction type and production type contracts.
- The audit reports of Africk Chez P.C. and Nykiel Carlin & Company.
- The evidence presented of the parties' costs and their conduct throughout the performance of the contractual obligation to AES.

Based thereon the Panel has made equitable adjustments to the materials presented and pronounces the Total Cost of the Medina Valley Project and the distribution of project revenues from AES as follows.





51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 6 of 27

| AWARD-MEDINA | | | | |
|---|---|---|---|---|
| Description | Project | Pope | Raymond | Ref. |
| PROJECT REVENUE/BENEFITS | | | | |
| Contract Revenue | $37,570,585 | | | Note 1 |
| Kebo | $5,757 | | | Note 2 |
| Bond Refund | $684 | | | Note 3 |
| Funds Received from Insurance | $1,000,000 | | | Note 4 |
| TOTAL REVENUE/BENEFITS | $38,577,026 | | | Note 5 |
| | | | | |
| TOTAL PROJECT COSTS | $36,619,196 | $21,676,973 | $14,942,223 | Note 6 |
| | | | | |
| | | | | |
| FUNDS/BENEFITS RECEIVED TO DATE | | | | |
| Payments Distributed from Project Revenue Funds | | $19,658,356 | $15,084,687 | Note 7 |
| Insurance Benefits Received | | | $1,000,000 | Note 8 |
| TOTAL FUNDS/BENEFITS RECEIVED TO DATE | | $19,658,356 | $16,084,687 | Note 9 |
| | | | | |
| PROJECT COSTS MINUS FUNDS/BENEFITS RECEIVED TO DATE | | $2,018,617 | -$1,142,464 | Note 10 |
| | | | | |
| PROJECT PROFIT/LOSS | $1,957,830 | $978,915 | $978,915 | Note 11 |
| PROJECT COSTS MINUS FUNDS/BENEFITS RECEIVED TO DATE + PROFIT | | $2,997,532 | -$163,549 | Note 12 |
| | | | | |
| INTEREST COST DUE POPE | | $637,182 | | Note 13 |
| | | | | |
| TOTAL DUE POPE | | $3,634,714 | | Note 14 |
| TOTAL DUE RAYMOND | | | $0 | Note 15 |
| | | | | |
| SOURCE OF FUNDS TO BE PAID POPE | | | | |
| Funds Available in Escrow Account Through 6/30/06 | | $3,072,550 | | Note 16 |
| Additional Funds Due Pope* | | $562,164* | | Note 17 |
| *Note: The additional funds due Pope are to be funded by the accumulated interest in the Escrow account as of the date of the satisfaction; any unsatisfied balance to be paid by Raymond to Pope | | | | |



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 7 of 27

## NOTES EXPLAINING AWARD FOR FINANCIAL DAMAGES

**Note 1:**
Both Pope and Raymond are in agreement that the revenue received from AES was $37,570,585. This includes a $2,500,000 payment that was a negotiated settlement payment as part of a final project payment made by AES in February 2003.

**Note 2:**
Pope and Raymond are in agreement that the project received $5,757 from Pope's subcontractor Kelso-Burnett. This related to work that Kelso-Burnett did directly for AES.

**Note 3:**
The $684 represents a refund of a bond payment from Willis. Absent contract language to the contrary, the panel views this payment as a reduction of costs to Raymond and an amount that should be paid in full back to Raymond. However, section 8 of the subcontract agreement between Pope and Raymond indicates "All revenue received by RMS (Raymond) and GC (Pope) as a result of or having to do with the Project from insurance companies or other parties shall be shared equally by the Parties after all costs are paid".



**Note 4:**
Section 8 of the subcontract agreement between RMS (Raymond) and GC (Pope) specifically states "All revenue received by RMS (Raymond) and GC (Pope) as a result of or having to do with the Project from insurance companies or other parties shall be shared equally by the Parties after all costs are paid".

**Note 5:**
Represents the sum of funds described in notes 1-4.

**Note 6:**
In determining the "total project costs" to be considered in determining the award, the panel considered the following:



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 8 of 27

1. The subcontract agreement between Raymond and Pope.
2. Audits (and supporting testimony) conducted by Africk Chez P.C. (Raymond) and Nykiel, Carlin & Co. Ltd (Pope) as directed by the panel.
3. Construction Industry Audit and Financial Publications.
4. Consistent treatment of costs for both Raymond and Pope.
5. Additional documents entered into evidence.
6. Industry experience and expertise of the panel members.

1. <u>The subcontract agreement between Raymond and Pope</u>

The subcontract includes paragraph 7 that states "The revenues paid to the Project shall be allocated as follows: First to pay the cost incurred by the Project to third parties; second to reimburse RMS and GC for their own costs and the time spent by their own personnel on the Project, including costs incurred in the preparation of the proposal.

Exhibit A to the subcontract sets out the obligations of RMS and the Engineer. The following are included in the scope of services.



- Engineering and design per Section 2.1.1 of the EPC Contract. Such engineering and design services per Section 2.1.1.1 of the EPC contract.
- Submittal of documentation and manuals as per Section 2.1.2 of the EPC Contract.
- Providing professional engineers and related personnel to perform the engineering and design services described above.
- Providing a project manager pursuant to Section 2.1.4 (e) of the EPC Contract.
- Services for performance testing, Start-Up and initial operation as per Section 2.1.9 and 2.1.10 of the EPC Contract.
- Personnel training per Section 2.1.12 of the EPC Contract.
- Reformatting and forwarding to Client per Section 2.1.16 of the EPC Contract programs report and other schedule information provided to RMS by GC.
- Procurement services for pre-engineered equipment listed (list follows).



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 9 of 27

Exhibit B to the subcontract lists obligations of the GC to include the following:



* Construction and construction management as per Section 2.1.1.2 of the EPC Contract.
* Providing labor and personnel as per Section 2.1.4 of the EPC Contract except for the professional design and engineering services and the project manager to be provided by RMS pursuant to Exhibit "A".
* Inspection and expediting services for items purchased by GC as per Section 2.1. of the EPC contract.
* Transportation, storage, disposal and related services per Section 2.1.7 of the EPC Contract.
* Procurement of all tools, materials and other elements necessary for construction including utilities and spare parts for equipment purchased by GC as per Section 2.1.11 of the EPC Contract, except item 2.1.11(e).
* Facility site access and Owner's accommodations as per Section 2.1.13 of the EPC Contract.
* Clean-Up and waste disposal services per Section 2.1.15 of the EPC Contract.
* Providing progress reports and other schedule information to RMS sufficient to fulfill Section 2.1.16 of the EPC Contract.
* Making all payments necessary to fulfill GC's obligations hereunder including payment of taxes and customs duties as per Section 2.1.17 of the EPC Contract and any royalties or license fees as required per Section 2.121 of the EPC Contract for items presented by GC.
* Providing all safety precautions and protection of persons and property as per sections 2.1.20 and 2.5 (including all subparagraphs) of the EPC Contract.
* Providing for items furnished by GC all documentation, samples, mock-ups or other submittals required tofulfill GC's obligations hereunder and those obligations of the Contractor in the EPC Contract that are within the scope of the GC's services hereunder.



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 10 of 27

2. Audits (and supporting testimony) conducted by Aftick Chez P.C. (Raymond) and Nykiel, Carlin & Co. Ltd (Pope) as directed by the panel.

The audits conducted by the two audit firms concluded the following:

Nykiel Carlin & Co. Engagement Summary
Pope project costs as reported to NCC                                          $22,843,563
Pope costs as reported by Nykiel Carlin & Co                                   $21,818,808*
*includes the following adjustments:
    GAAP Exception for Construction Equipment        $959,754
    GAAP Exception for Small Tools                   $161,064

Aftick Chez P.C. Engagement Summary
RMS (Raymond) costs as originally reported                                     $17,029,515
RMS costs as restated by Aftick Chez P.C.                                      $16,950,955

3. Construction Industry Audit and Financial Publications

Publications and pertinent subsections included the following:

a. AICPA Audit and Accounting Guide, Construction Contractors, with Conforming Changes as of May 1, 2005.



The "Guide" includes Statement of Position 81 which includes the following provisions in paragraph 72:

"72. A contracting entity should apply the following general principles in accounting for costs of construction-type and those production-type contracts covered by this statement. The principles are consistent with generally accepted accounting principles for inventory and production costs in other areas, and their application requires exercise of judgment.
    a. All direct costs, such as material, labor, and subcontracting costs, should be included in contract costs.
    b. Indirect costs allocable to contracts include the costs of indirect labor, contract supervision, tools, and equipment, supplies, quality control and inspection, insurance, repairs, and maintenance, depreciation and amortization, and, in some circumstances, support costs, such as central preparation and processing of payrolls. For government contractors, other types of costs that are allowable or allocable under pertinent government



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 11 of 27

control regulations may be allocated to contracts as indirect costs if otherwise allowable under GAAP.[11]    Methods of allocating indirect costs should be systematic and rational.  They include, for example, allocations based on direct labor costs, direct labor hours, or a combination of direct labor and material costs.  The appropriateness of allocations of indirect costs and of the methods of allocation depends on the circumstances and involves judgment.

c. General and administrative costs ordinarily should be charged to expenses as incurred but may be accounted for as contract costs under the completed-contract method of accounting[12] or, in some circumstances, as indirect contract costs by government contractors.[13] "

Note: footnotes referenced refer to government contracts and the use of the completed contract method.

b. *Accounting Research Bulletin (ARB) 43*

Included in the provisions of this publication considered by the panel was Statement 3 which states the following:

*"Statement 3*
*The primary basis of accounting for inventories is cost, which has been defined generally as the price paid or consideration given to acquire an asset. As applied to inventories, cost means in principle the sum of the applicable expenditures and charges directly or indirectly incurred in bringing an article to its existing condition and location.*

*Discussion*
*5. Inventories are presumed to be stated at cost. The definition of cost to inventories is understood to mean acquisition and production cost.[2] and its determination involves many considerations. Although principles for the determination of inventory costs may be easily stated, their application, particularly to such inventory items as work in process and finished goods is difficult because of the variety of considerations in the allocation of costs and charges.  For example, variable overheads are allocated to each unit of production on the basis of the actual use of the production facilities.  However, the allocation of fixed production overheads to the costs of conversion is based on the normal capacity of the production facilities. Normal capacity refers to a range of production levels.  Normal capacity is the production expected to be achieved over a number of periods or seasons under normal circumstances, taking into account the loss of capacity resulted from planned*





51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 12 of 27

maintenance. *Some variation in production levels from period to period is expected and establishes the range of normal capacity. The range of normal capacity will vary based on business- and industry-specific factors. Judgment is required to determine when a production level is abnormally low (that is, outside the range of expected variation in production). Example of factors that might be anticipated to cause an abnormally low production level includes significantly reduced demand, labor and material shortages, and unplanned facility or equipment downtime. The actual level of production may be used if it approximates normal capacity. In periods of abnormally high production, the amount of fixed overhead allocated to each unit of production is decreased so that inventories are not measured above costs. The amount of fixed overhead allocated to each unit of production is not increased as a consequence of abnormally low production or idle plant.*

*5A. Unallocated overheads are recognized as an expense in the period in which they are incurred. Other items such as abnormal freight, handling costs, and amounts of wasted materials (spoilage) require treatment as current period charges rather than as a portion of the inventory cost. Also, under most circumstances, general and administrative expenses should be included as period charges, except for the portion of such expenses that may be clearly related to production and thus constitute a part of inventory costs (product charges). Selling expenses constitute no part of inventory costs. The exclusion of all overhead from inventory costs does not constitute an accepted accounting procedure. The exercise of judgment in an individual situation involves a consideration of the adequacy of the procedures of the cost accounting system in use, and soundness of the principles thereof, and their consistent application.*"

*e. FAS 151: Inventory Costs and amendment of RB No. 43, Chapter 4*

Included in the provisions in this publication considered by the panel is the following in paragraph 5A.

"*Also under most circumstances, general and administrative expenses should be included as period charges, except for the portion of such expenses that may be clearly related to production and thus constitute a part of inventory costs (or product charges).*"





51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 13 of 27

### d. *Accounting Terminology Bulletin No. 2*

The bulletin defines cost as follows

*"Cost is the amount, measured in money, of cash expended or other property transferred, capital stock issued, services performed, or a liability incurred, in consideration of goods or services received or to be received".*

### e. *Statement of Auditing Standards, AICPA*

The dictionary defines

*"Cost as "an expenditure or outlay of cash, other property, capital stock, or services, or the incurring of a liability therefore, identified with goods or services purchased or with any loss incurred, and measured in terms of the amount of cash or cash paid or payable or the market value of other property, capital stock, or services given in exchange".*



4. <u>Consistent treatment of costs for both Raymond and Pope</u>

In determining "project costs", the Panel was attentive to being consistent with their treatment of specific categories of costs for both Raymond and Pope. For example, the panel members were attentive to being consistent in their treatment of cost classifications such as the following:

- Labor burdens to include payroll taxes
- Treatment of home office costs
- Identification of home office personnel identified as project costs
- Treatment of costs allocated to the project

5. <u>Additional documents entered into evidence.</u>

These included the
- Interim Settlement Agreement
- Project Cost Report(s)
- Attorney written responses to questions asked by Panel



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 14 of 27

6.  Industry experience and expertise of the panel members

The Panel members have considerable expertise in applying the necessary judgment
required to apply the accounting principles and methodologies noted above the
determination of project costs for the Medina project.

Based on all the evidence and considerations noted above, the panel has identified the
Project Costs to consist of the following:

Pope Project Costs:

| Line | Description | $ Amount | Reference / Note |
|------|-------------|----------|------------------|
| 1 | Direct labor | $2,522,229 | NCC 212 |
| 2 | Materials | 1,658,913 | NCC 158-162 |
| 3 | Subcontractors | 14,807,231 | NCC122 |
| 4 | Owned equipment and tool cost as determined by the panel | 579,752 | Determined by panel as fair cost to project based on value added to construction process. |
| 5 | Union benefits | 697,836 | NCC 176-177 |
| 6 | Payroll taxes·labor | 277,750 | NCC 179 |
| 7 | Workmen compensation | 149,092 | NCC adjusted from $157,824 |
| 8 | Equipment rental | 172,207 | NCC 152-153 |
| 9 | Bond | 102,100 | NCC 45 |
| 10 | Delivery costs | 38,142 | NCC 45 |
| 11 | Project supervision | 206,811 | Supervision costs and burdens |
| 12 | Site complex | 246,538 | Adjusted per NCC 142-146 |
| 13 | Other third party costs | 218,372 | NCC 169-170 |
| | TOTAL | $21,676,973 | |





51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 15 of 27

Raymond Project Costs:

| Line | Description | $ Amount | Reference / Note |
|---|---|---|---|
| 1 | Direct labor | $2,699,463 | AWP 101; includes Doyan that had a subcontract |
| 2 | Materials | 8,875,619 | AWP 208-227 |
| 3 | Subcontractor costs | 1,695,169 | AWP 192 (excludes Solar) |
| 4 | Raymond labor burdens | 1,133,410 | Per AC labor burdens for direct labor |
| 5 | Minus home office personnel disallowed | -44,207 | Costs and burdens deducted for non project personnel |
| 6 | Other costs viewed as project costs | 582,769 | Costs not included are allocated costs, related costs, costs related to Pope default, and arbitration costs. |
| | TOTAL | $14,942,223 | |



**Note 7:**
Pope and Raymond have a disagreement as to the amount paid to Pope and Raymond. There is approximately a $7,000 discrepancy between the two parties. The Panel has concluded the following amounts:

|  |  |
|---|---|
| Paid to Date to Pope | $19,658,356 |
| Paid to Date to Raymond | $15,084,687 |

**Note 8:**
The Panel has concluded that the $1,000,000 insurance policy has benefited Raymond and should be considered as part of the funds/benefit Raymond has received to date. As referenced in Note 4, section 8 of the subcontract agreement between RMS (Raymond) and GC (Pope) specifically states "All revenue received by RMS (Raymond) and GC (Pope) as a result of or having to do with the Project from insurance companies or other parties shall be shared equally by the Parties after all costs are paid".

**Note 9:**
This is the sum of the amounts described in Note 7 and Note 8.





51 Y 110 01689 03
Raymond Management Services, Incorporated
        Vs
William A. Pope Company
Page 16 of 27

**Note 10:**
This represents the difference between the project costs as determined by the Panel (Note 6) and the revenue/benefit received to date (Notes 7 through 9).

**Note 11:**
This represents the total project revenue including insurance refunds and insurance policy money benefits minus the project costs as determined by the panel.   Per the subcontract agreement, this remaining profit or loss are to distributed equally to Pope and Raymond.

**Note 12:**
This is the sum of the amounts described in Note 10 and Note 11.

**Note 13:**
The Panel has determined that Pope is due interest on their outstanding June, July, and August 2001 invoices and on the amount due per the interim settlement agreement. The Panel has used the Illinois Statutory Prejudgment interest rate of 5%.



**Note 14:**
The amount due Pope is the sum of the items described in Note 12 plus the interest due Pope as described in Note 13.

**Note 15:**
Given the funds and benefits Raymond has received to date, there is no amount due Raymond.

**Note 16:**
Per bank statement for the escrow account provided to the Panel by Raymond.

**Note 17:**
The total amount to be paid Pope is $3,634,714.  The funds available in the Escrow Account Balance through 6/30/06 were $3,072,550. The additional funds due Pope are to be funded by the additional interest in the Escrow account as of the date of the satisfaction; any unsatisfied balance to be paid by Raymond to Pope.



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 17 of 27

## Basis of Decision

Starting in early 2000 the parties worked together with each contributing its individual expertise and that of its respective subcontractors, vendors and consultants to permit them to seek a Request for Proposal from AES. The AES Medina Valley Cogeneration Project Request for Proposal consisted of two binders of over 650 pages, dated 2/18/00, created by the Owner's ("AES") consultants Sargeant & Lundy and others. The documents contained therein were identified as "Inquiry Documents" to present bidders with specification data upon which to base a bid for Engineering, Procurement and Construction ("EPC") services on the project. The binders contained data that AES identified as "conceptual" and drawings that were "for reference only". The material did specify that Solar Turbines and ERI heat recovery steam generators were to be used. The bidders were responsible for a design and layout that met AES's specifications and were to submit project schedules, general arrangement and flow schematics with a Quality Assurance ("QA/QC") manuals and Plan. The bidder's submissions, if accepted, would be the basis for any contract that may be issued. The bidder's proposals were to be submitted by 3/20/00 with a lump sum price and Plant Guarantees.

The successful bidder would be responsible for the final design, supply, erection and commissioning of the cogeneration power plant. Article 3.2.1.10 of the material recited a "Project Schedule" with maximum dates identified for specific milestones as:

| | |
|---|---|
| Award of EPC Contract and | |
| Issuance of Construction Permit | 4/15/00 |
| Equipment starts | 11/1 and 12/1/00 |
| Chiller plant in service | 5/1/01 |
| Steam Turbines start & test | 5/4/01 |
| Synchronize steam turbines | 6/4/01 |

This schedule identified approximately a 13 ½ month period for the EPC activity, startup and commissioning. The bidder was to guarantee the "earliest possible commercial operation" date.

Articles 3.4 and 3.10.1.1 identified applicable "Design Codes & Standards". Article 3.3.14.1 states that the "Scope of Work...workmanship shall be performed in accordance with standard utility practice... All of the work shall be...complete...and to the full satisfaction of" AES. Article 3.3.14.2.4 addresses "Acceptable and Unacceptable Work".





51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 18 of 27

"All...defective...work shall be remedied at the expense of the Contractor... The Owner will not pay for removal or replacement of damaged or faulty material... The Owner shall make final decisions as to whether work is or is not acceptable."

RMS did submit a bid proposal on 3/23/00 for the development of the Medina Valley Cogeneration Project. This bid proposal was based on the collective cost estimations of Pope and RMS.

The 3/22/00 Proposal of RMS was executed by Michael J. DuBois ("DuBois"), General Manager, and identified the RMS team "principal participants" as Doyen and Associates, Incorporated ("Doyen") and Pope.    RMS and Doyen are identified as "subsidiaries of Raymond Professional Group, Inc." ("RPG").

RMS and its team members were to provide expertise in each discipline:
* RMS to provide "all project management, administration and control services".
* Doyen to provide its extensive power related engineering design experience
* Pope, a mechanical contractor with extensive experiences in power related work, would serve as the General Contractor with its support team of:
* Kelso Burnett Co., a leader in electrical construction and
* Joseph J. Henderson, an experienced provider of civil and structural services.



Mr. Du Bois' cover letter recites that RMS's proposed schedule meets the AES May and June 2001 milestone dates but adjusts the November and December 2000 milestone dates to January 31, 2001. There was a need for more information from Solar, AES's specified supplier, before RMS would be able to provide the power generation guarantees. The lump sum proposed price was $34,702,900 with an addendum of "Optional Prices" for alternates and additional services. This price included a potential profit of from four to five million dollars based on the parties estimated cost to perform the EPC project. It was intended that ultimately this profit would be shared equally be RMS and Pope.

After the Proposal was submitted to AES, communication occurred between the parties and a meeting was held on 3/27/00. RMS submitted a Revised Proposal dated 3/29/00 to respond to matters discussed, particularly to provide technical clarifications and address AES's question of "Why RMS for this Project?" The cover letter to address the issues was executed by Ross R. Porter, RMS's Business Development Manager. Mr. Porter expounds on the "Reasons to choose RMS" by reciting:



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 19 of 27

- "IN-HOUSE staff of 600 professionals". Presumably this was the entire corporate staffing of RPG with its subsidiaries and affiliates.
- "VALUE ADDED engineering capabilities."
- "Complete control over design to...select efficient equipment."
- "Fast track for material and equipment specifications and purchases." The fast track demands on the Project became materially compressed by the date of the execution of the Prime Contract of RMS and AES.
- "Control over interferences to reduce schedule impacts."
- "Bonding capacity...well within the limits required for this project." A questionable statement since Pope and its surety provided a bond for over $20 million to AES.

The adjusted lump sum of the Revised Proposal was $35,371,990 with an addendum of "Optional Prices".



On 5/1/00, after approximately five (5) weeks had passed, RMS received a verbal notice to proceed from AES. This notice accelerated communication between RMS, Pope and their subcontractors to prepare for a written confirmation of the contract with AES. Contracts with subcontractors were prepared and executed. Not until early July, after an additional nine (9) weeks had passed, RMS received a written letter of intent form AES executed 7/7/00. With this notification the parties were able to move forward with their respective design, procurement and construction site preparations. This impacted the "Project Schedule" by compressing the EPC activity, startup and commissioning to approximately an 11 month period with a bigger threat of winter construction conditions. On 9/12/00, after an additional nine (9) weeks had passed, the EPC contract for a lump sum of $34,600,000 was executed by AES and RMS. It identified "administrative allocations of:

    a) materials    $5,000,000
    b) labor      $19,600,000
    c) equipment $10,000,000"

The contract recited "Guaranteed Commercial Operation Dates" for completion in accordance with the AES Project Schedule with a "Final Acceptance Achievement Date" of 6/1/01. If Commercial Operation was not achieved by that date RMS was to pay AES a "Late Completion Payment rebate" of $1,500 per calendar day thereafter until Commercial Operation was achieved. The contract identified the level and degree of quality AES expected from RMS in its performance under the documents.



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 20 of 27

- Paragraph 2.1.6 "Inspection and Expediting"
  "...to ensure...and to protect Owner (AES) against defects and deficiencies in...Work."
- Paragraph 2.3.1 "Standard of Performance":
  "...(b) the Project shall be constructed and erected (i) in a good workmanlike manner, (ii) using Good Utility Practices for power stations... intended to have at least a 30-year useful life...".
- Paragraph 2.6 "Performance Criteria";
  "Contractor guarantees the Facility will be capable of achieving all of the applicable performance specifications...".

Paragraph 10.1 "Warranties" is a complete recapitulation of all the contract relevant guarantee provisions.

RMS and Pope knew that this EPC contract with AES had risks that required them and their subcontractors to perform, as efficiently and capably as reasonably possible, the work necessary to complete the project and meet the performance requirements.



A Professional Services Agreement was entered into between RMS and Doyen on 9/12/00 and executed by Douglas J. Chidley, as President of Doyen, and DuBois in his capacity as General Manager of RMS. The scope of Doyen's engineering, architectural and technical services were defined in Exhibit A for a lump sum price quoted in Exhibit B to the Agreement of $2,505,386. RMS never identified Doyen as a subcontractor or identified Doyen's contract expenditures as a consultant under the RMS "Project Performance Group" allocation on its Sworn Contractor's Statement which accompanied its Pay Request Invoices to AES.

A Subcontract between RMS and Pope, although transmitted and dated 9/12/00, was not executed by Pope until 1/12/01, a date by which Pope was well aware of the complications and problems arising on the job. There had been an absence of Doyen and RMS at the weekly site meetings since early November through December. Evidence was introduced of a 11/7/00 email (R135927) from Doyen to the Raymond Professional Group ("RPG") forecasting a slowdown and possible staff reduction at Doyen. It asked if RPG had current and future needs for the available engineers and designers. On 12/15/00 an interoffice email (R047288) to RPG reflected that, as to the AES project, "Doyen will overrun the engineering budget by over 7000 hours" and "... watching closely... that no one charges this project unless they are working on one of the remaining items..." to justify the issuance of CCRs for scope changes. In February 2001 RPG's Project Director T. McPartland "( McPartland") sent an interoffice letter to RPG requiring his



51 Y 110 01689 03
Raymond Management Services, Incorporated
                    Vs
William A. Pope Company
Page 21 of 27

personal approval of timesheets pertaining to AES/Cilco projects before submission to accounting .

Exhibits A and B to the Subcontract Agreement identified each party's obligations under the Agreement. The dollar value of the Subcontract was not identified or fixed but provided, at Paragraph 7 of the Terms and Conditions that the periodic payments received from AES would be allocated:

1. to pay project costs incurred and due 3rd parties
2. to reimburse each party his own costs expended on the Project
3. an allowance to each party for the succeeding month's project expenses
4. any balance to be divided equally between the parties

The paragraph recites that AES is "to pay undisputed amounts" of RMS's pay requests and that "the undisputed amounts of GC's (Pope) pay request will be paid by RMS immediately following receipt of payment from client" (AES).



As of 12/31/00 the parties were to determine and agree to expended project costs to date and related profitability. Paragraph 8 of the Terms and Conditions provides that RMS shall not agree to any Change Order ("CO") regarding the Project without Pope's approval. Pope shall only be entitled to CO's from RMS to the extent RMS gets approval for the CO from AES. This language is interpreted to mean that both RMS and Pope must secure each others approval of proposed Change Order Requests ("CNN") to be submitted to AES.

Pope's execution of the Subcontract, which incorporated the AES EPC contract documents, reaffirmed its commitment to perform all work chargeable to the project as its contribution to the task of satisfying the contractual obligations of the "Guaranteed Commercial Operation Dates" and achieve final acceptance by AES. The financial risks had been accepted by RMS and Pope when they joined together to successfully complete the project and share any profits or losses equally.

By early spring 2001 it was obvious that Doyen's engineering activity had not materially reduced. In March McPartland issued another interoffice email to RPG for a 3 month budget for Doyen with no additional charges to be authorized. The project was $400,000 over budget and "the bleeding must stop". In April DuBois communicated (R022294) the need to write off Doyen hours.

The Panel is of the opinion that a significant component of the dispute between the two parties stems from the lack of definition of "cost" in the Subcontract Agreement between RMS and Pope. The Agreement indicates that payments received from AES (after



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 22 of 27

payment due 3rd parties) would be allocated to reimburse each party its own "costs" expended on the Project. The Subcontract between the two parties is vague as to the definition of "cost" and as such is poorly worded.

There are varying opinions in the industry as to what makes up a cost. One might define cost as an expenditure that relates only to permanent materials, and labor and equipment. Labor and equipment are incurred to convert material into a permanent project and are commonly referred to as "conversion costs" in that they are expended to "convert" the materials into a completed project. In the design process, a similar definition would be defined as the designer labor cost and materials necessary to prepare needed contact documents.

A more expanded view of "cost" would include necessary support costs such as estimating costs, supervision, copying costs, travel costs to and from the site, etc. These costs are of course more difficult to trace to the needed process of "converting materials" into a completed project.

The definition of cost is also made more complicated when an entity has inter-company transactions such as internal equipment costing system for owned equipment, or an internal costing process for use of copying equipment or CAD equipment.



The Panel is of the opinion, that the two parties should have delineated what they meant by "cost" in the Subcontract Agreement. The Agreement that the parties executed is similar to a project owner signing a "cost-plus" contract with a contractor to perform construction services and not defining what "cost" is. Such contracts have the potential to lead to disputes between two parties as to what is reimbursable as a cost and what cost elements are covered by the plus component of the contract.

In addition to the Subcontract being vague as to the definition of "cost", neither RMS nor Pope provided convincing arguments at the hearings as to what the two parties bilaterally agreed to as to the meaning of "cost" in their Agreement. Absent RMS and Pope defining "cost" or delineating acceptable costs in the Agreement, the Panel had to make this determination as to costs that were reimbursable under the definition of "cost". The Panel considered the following in making this determination:

1. The Subcontract Agreement between Raymond (RMS) and Pope.
2. Audits (and supporting testimony) conducted by Africk Check P.C. (Raymond) and Nykiel, Carline & Co. Ltd (Pope) as directed by the Panel.
3. Construction Industry Audit and Financial Publications.



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 23 of 27

4. Consistent treatment of cost treatment for both Raymond (RMS) and Pope.
5. Documents and testimony entered into evidence.
6. Industry experience and expertise of the Panel members.

<u>RMS Claim No. 1 "Weld Repair Failure Costs"</u>
And
<u>Pope Claim No. 11 "Weld Upgrading"</u>

RMS's performance claim alleges that Pope "knowingly and negligently deviated from the applicable standard of care relative to the construction means and methods employed and the procedures followed for welding on the Project..." RMS recites the discovery of "slag" in a flush of the turbine oil piping after which it hired a consultant to randomly radiograph several field welds, the majority of which failed to meet code standards. Thereafter "...to meet quality and safety commitments to AES" RMS elected to expand the testing of field welds.



Pope's claim stems from its position that RMS introduced a program of an additional degree of examination by radiographic testing of the pipe butt welds and thereby increased the standard to be applied to what would be "acceptable" welds beyond the contractual obligation. Pope recites that it met the standards set forth in the contract documents including the examination, inspection and testing requirements of ASME B31.1 and the MCAA Pipe Joining Methods and quoted that "the degree of examination and acceptance standards beyond the requirement of this code shall be a matter of prior agreement between the erector and the Owner".

It is the opinion of the Panel based on their experience and the hearing testimony that the primary responsibility for on site inspection and project management lies with RMS. This was also the owners opinion witness the 3/2/01 AES communication to RPG that RMS should send quality assurance people to the site before any startup and commissioning started. This was followed on 3/9/01 with the discovery of leaks in the Fire Protection piping and on 3/26/01 the discovery of "slag" in the turbine oil piping flush. Pope was not in compliance with B31.1 as to the lube oil piping system. All of the welds in this system should have had radiographic inspection.

Raymond's discovery of "slag" in the turbine oil piping flush indicates that the flush procedure, standard in welded piping systems, was working as it was intended. Primarily the flush procedure is designed to remove any debris in the piping system caused by its construction and is not an indication of faulty welds.



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 24 of 27

The Panel reviewed all the evidence presented and in particular
- the weld requirements contained in the AES Request for Proposal with its reference to:
  a) the applicable Codes and the statement that "the most stringent requirements shall apply"
  b) the "design" of the several piping systems
  c) that pipe material, fabrication and erection be in adherence with ANSI B31.1 and the TIG root and fill pass
- the Doyen Technical spec
- The Doyen Piping Design Criteria
- The AES EPC Contract sections 2.1.6 & 2.3.1
- ASME B31.1 Chapter 4, Section 136
  a) Paragraph 136.4.2
  b) Paragraph 136.4.5
  c) Table 136.4
- The Pope subcontract incorporation of the AES EPC Contract Section 2.1.6 which was the mutual obligation of RMS and Pope.



The Panel recognizes that there are different levels and types of welds, with each installation requiring a specific type of weld particular to that project. Each type and circumstance has an effect on the cost of providing the weld. Those welds requiring radiographic testing are of a higher quality and are more expensive to produce. Both RMS and Pope, while putting together their submittal to the owner, should have recognized that for this project to meet the owners requirements, radiographic testing was mandated and that the cost to produce the higher quality weld and the testing would have to be included in the proposal.

Both parties had an obligation to pursue surveillance of all weldments on the project, both those accomplished on and off site. Their burden was to deliver to AES a power station "intended to have at least a 30-year useful life". This was to be accomplished by protecting AES "against defects and deficiencies" and guarantee that the "Facility will be capable of achieving all of the applicable performance specifications".

The Weld claim expenditures of RMS and Pope are recognized as part of the Total Project Cost of Work.



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 25 of 27

## The Pope Claims

Pope's Claims No 1-28 are identified as being "performance based" and caused by RMS's negligent performance of Project engineering and Project management. This caused project costs to greatly exceed the bid cost estimates that were used in the Proposal originally submitted to AES.

Many of Pope's claims pertain to work that had either been completed, pursuant to the original design and modification directives or not included in Pope's bid cost estimate at Doyen's direction. As the startup/commissioning activities progressed, RMS issued Punch Lists, Rapid Memos, Directives and Revisions that were necessary due to engineering oversights. These activities were now necessary so the Plant could operate and function as intended and they added costs to both, construction and delay of the project.

Joe Rocha "(Rocha") of Pope testified and presented evidence as to many of the Pope Claims. He identified claims which had been reduced in value by an adjustment that removed Pope's Overhead and Profit.



After the first Punch List of AES and RMS, dated 4/01, was received and completed, thirty-one (31) rapid memos were issued between 5/1/01 and 8/31/01. These work orders were for changes RMS directed and are identified in Claim 1 at its adjusted value of $198,361.56. By the end of August 2001 Pope began to demobilize to reduce project costs. Thereafter it utilized the man power of its local subcontractors to furnish construction labor, under Pope's supervision, for completion work.

Rocha testified to several Claims that were additions and corrections to equipment installations that had been completed by Pope per the original design and now, during the startup and commissioning activities, required modification to achieve proper performance.

Based on the evidence presented as to the nature of the contractual relationship between the parties and their conduct through the pre-bid, bid, contract and performance stages of this EPC start-up/commission project, the Panel finds that the costs claimed by Pope in its Claims No 1-10, 12-15, 16 being withdrawn, and 17-23, 25 and 27 are properly recognized as part of the Total Project Cost of Work.



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 26 of 27

Claim No. 24 Equipment & Specialties Cost Overruns, Claim No. 26 Delay & Extended Job Duration and Claim No. 28 Engineering & Project Management Overruns, although recognized as part of the Total Project Cost of Work, necessitate comment.

The parties accepted the AES Contract eleven month period for the performance of design, procurement, construction, installation, startup and commissioning. The acceptance date of 6/1/01 was completely unrealistic to satisfy the tasks before them. The initial engineering design, procurement, construction and installation of equipment had been substantially accomplished through a "fast track" effort. The startup and commissioning required adjustments and alterations to meet the contractual guarantees and secure AES's acceptance. This was a separate burdensome task and the costs to achieve all these tasks were grossly underestimated.

Claim No. 24 did not so much require creative professional services as it did require business prudence which was lacking. The delay and extended job duration of Claim 26 was impacted by the equipment acquisition activity, the weld problem and by the underestimation of the magnitude of the startup and commissioning tasks to which AES contributed.



The alleged overruns of Claim No. 28 has some merit. Although there was no evidence of errors and omissions by Doyen, there was evidence of negligence by all the parties. An element that may have contributed to the excessive costs experienced is the entwinement of the several entities that were utilized by RMS. The subsidiaries, affiliates and service vendors utilized and contracted with to satisfy RMS's contractual duties all revolved around Douglas Chidley and Jean Chidley. This type of business practice raises a question of independence in record keeping and favoritism to the detriment of third parties.

11/29/2006  08:40   3896922371                    ADRIAN                         PAGE  02



51 Y 110 01689 03
Raymond Management Services, Incorporated
             Vs
William A. Pope Company
Page 27 of 27

The above sums are to be paid on or before 30 days from the date of this Award.

The administrative fees and expenses of the American Arbitration Association ("the Association") totaling $25,250.00 and the compensation and expenses of the Arbitrators totaling $240,054.43 shall be borne as incurred.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims and counterclaims not expressly granted herein are hereby denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

Dated:          2006

By the Panel:

_____
James J. Adrian
Arbitrator

_____
Franklin I. Kral
Arbitrator

_____
Allan M. Pickus
Arbitrator



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 27 of 27

The above sums are to be paid on or before 30 days from the date of this Award

The administrative fees and expenses of the American Arbitration Association ("the Association") totaling $25,250.00 and the compensation and expenses of the Arbitrators totaling $240,054.43 shall be borne as incurred.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims and counterclaims not expressly granted herein are hereby denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

Dated: November 30, 2006

By the Panel:

_____        _____        _____
James J. Adrian                 Franklin I. Kral                Allan M. Pickus
Arbitrator                      Arbitrator                      Arbitrator



51 Y 110 01689 03
Raymond Management Services, Incorporated
Vs
William A. Pope Company
Page 27 of 27

The above sums are to be paid on or before 30 days from the date of this Award.

The administrative fees and expenses of the American Arbitration Association ("the Association") totaling $25,250.00 and the compensation and expenses of the Arbitrators totaling $240,054.43 shall be borne as incurred.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims and counterclaims not expressly granted herein are hereby denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

Dated: November 3, 2006

By the Panel:

_____          _____          _____
James J. Adrian                  Franklin J. Kral                 Allan M. Fickus
Arbitrator                       Arbitrator                       Arbitrator

Last Update: August 26, 2008
06 B 16748

## CERTIFICATE OF SERVICE

I, Deborah Smith certify that on December 23, 2008, I caused to be mailed by United

States first class mail copies of the foregoing Supplement to Memorandum Opinion to the

following:

Jason M. Torf, Esq.
Eugene J. Geekie, Jr., Esq.
David A. Howard, Esq.
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606
Counsel for Debtors

Harley J. Goldstein, Esq.
Sven T. Nylen, Esq.
Bell, Boyd & Lloyd LLP
70 West Madison Street
Suite 3100
Chicago, IL 60602
Official Committee of Unsecured Creditors

Gretchen Silver, Esq.
Office of the U.S. Trustee
219 S Dearborn St
Room 873
Chicago, IL 60604

Susan K. Gummow, Esq.
John F. O'Brien, Esq.
William J. Hacker
Clausen Miller, P.C.
10 South LaSalle Street
Chicago, IL 60603
Counsel for William A. Pope Company

Harold E. McKee, Esq.
Riordan, Donnelly, Lipinski, & McKee, Ltd.
10 North Dearborn Street
4th Floor
Chicago, IL 60602
Counsel for National Fire Insurance Company

Deborah Smith
Courtroom Deputy